**MERIT INSURANCE COMPANY, Plaintiff-Appellant,**

v.

**LEATHERBY INSURANCE COMPANY a/k/a Western Employers Insurance Company, Defendant-Appellee.**

No. 82-2885.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1983.

Decided July 12, 1983.

As Amended Aug. 18, 1983.

Rehearing and Rehearing En Banc Denied Sept. 12, 1983.

Certiorari Denied Dec. 5, 1983. See 104 S.Ct. 529.

674

Thomas P. Sullivan, Barry Sullivan, Chicago, Ill., for plaintiff-appellant.

Mitchell S. Rieger, Schiff, Hardin & Waite, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

■ This appeal from an order under Rule 60(b) of the Federal Rules of Civil Procedure setting aside an arbitration award requires us to decide whether the failure of one of the arbitrators to disclose a prior business relationship with a principal of one of the parties to the arbitration justified the district court in using its powers under Rule 60(b) and the United States Arbitration Act, 9 U.S.C. §§ 1 *et seq.,* to set aside the award.

In 1972 Merit Insurance Company made a contract with Leatherby Insurance Company to reinsure claims under certain insurance policies that Leatherby had issued. Merit later sued Leatherby in federal district court for fraud in inducing the contract. Jurisdiction was based on diversity of citizenship. Leatherby moved the court for an order under 9 U.S.C. § 4 directing the parties to arbitrate their dispute in accordance with the arbitration clause in the contract, and in 1977 the district court entered such an order. See *Merit Ins. Co. v. Leatherby Ins. Co.,* 581 F.2d 137, 139 (7th Cir.1978), and for collateral litigation *Merit Ins. Co. v. Colao,* 603 F.2d 654 (7th Cir. 1979).

The arbitration was conducted under the auspices of the American Arbitration Association. Each party appointed one arbitrator and together the parties appointed from a list formulated by the AAA the third or "neutral" arbitrator, a Chicago lawyer named Jack Clifford. At the first meeting of the arbitration panel the panel agreed that the other two arbitrators would also be neutrals, rather than representatives of the parties that had appointed them.

After an arbitration that lasted three years and produced a hearing transcript of 16,000 pages, the panel on December 1, 1980, unanimously awarded Merit $10,675,-000 on its claim. Merit petitioned the district court to confirm the award under 9 U.S.C. § 9. Leatherby opposed confirmation in part on the ground that the arbitrators had been biased, as indicated by certain

evidentiary rulings in Merit's favor and by a comment the arbitrator appointed by Merit had made in the course of the proceedings. No charge of bias was leveled against Clifford specifically. The district judge rejected all of Leatherby's arguments and on November 19, 1981, confirmed the award. A month later he rejected Leatherby's first motion under Rule 60(b) to set it aside. Leatherby appealed to this court from both the order confirming the award and the order denying the Rule 60(b) motion. On May 12, 1982, while the appeal was pending, Leatherby filed a second Rule 60(b) motion, this one based on Leatherby's alleged discovery the previous month that Clifford had once worked under Merit's president and principal stockholder, Jerome Stern, at Cosmopolitan Insurance Company. The appeal was dismissed on Leatherby's motion, and an evidentiary hearing on its new charge of bias was held in the district court at the end of August. On November 4, 1982, in an oral opinion, the court granted Leatherby's Rule 60(b) motion and set aside the arbitration award, and Merit has appealed under 28 U.S.C. § 1291. See *University Life Ins. Co. of America v. Unimarc Ltd.,* 699 F.2d 846, 848 (7th Cir.1983).

The hearing in the district court brought out the following facts. The chairman of the board of Cosmopolitan had hired Clifford late in 1960 to be head of the claims department. At the same time Stern had been promoted to executive vice-president of the company. As the vice-president in charge of the claims department Clifford reported to Stern. This relationship lasted till the beginning of 1963 when Stern left Cosmopolitan to enter private practice. Clifford left Cosmopolitan shortly afterward. Clifford and Stern both testified that they had had little professional contact while at Cosmopolitan and no social contacts then or since. Clifford had been promised substantial autonomy by the chairman of the board when he took over the claims department, and Stern—who had no background in claims evaluation and was preoccupied with corporate acquisitions and other matters unrelated to Clifford's responsibilities—gave Clifford a loose rein.

Their principal contact came in meetings held at intervals of several months between Stern and the department heads who reported to him. They also had occasional brief discussions over specific claims; once Clifford was asked to review the claims reserves of an insurance company that Cosmopolitan was thinking of buying; and, on orders from above, Stern once required all of his subordinates, including Clifford, to take lie-detector tests. After Clifford and Stern entered private practice they spoke to each other on the phone on one or two occasions but these contacts were of no significance, and until the arbitration the two men had not met face to face since 1963. Rotheiser, a vice-president of Merit, was also employed at Cosmopolitan during Clifford's tenure, but he was the head of a separate department and according to both his testimony and Clifford's they had no dealings with one another.

The foregoing account is drawn in large part from the testimony of Clifford himself, of whom the district judge stated, "I do not find Mr. Clifford to be a credible witness." But read in context this statement principally refers not to Clifford's testimony about his time at Cosmopolitan—testimony corroborated by Stern and Rotheiser, whom the district judge did not find to be incredible and who were not contradicted by any other witness—but to Clifford's explanation of why he omitted to mention his affiliation with Cosmopolitan either when he filled out the forms that the American Arbitration Association requires from its prospective arbitrators or when he first saw Stern at the arbitration hearing. In 1975 the AAA had sent Clifford a "panel data sheet" which contained a space headed, "My prior occupational affiliations have been . . . ." All that Clifford listed in this space (having listed private practice as his current occupation) was his job as claims manager for Firemen's Fund American Insurance Companies from 1949 to 1960. Clifford testified that he had not mentioned Cosmopolitan in part because he was not interested in doing the kind of arbitration for which his experience there would have been relevant. The

judge disbelieved this because it was the same kind of work Clifford had done at Firemen's Fund. (The judge made no comment on Clifford's other, and more plausible, explanation for not mentioning his work for Cosmopolitan: it was not a useful reference. Since the company had been liquidated, getting an evaluation of Clifford's work for the company would have been difficult.) But the judge could not have believed that the purpose of the omission was to prevent Clifford from being disqualified as an arbitrator, for the Merit-Leatherby arbitration was still two years in the future when Clifford mailed back the form. The judge conjectured, rather, that Clifford had been embarrassed to broadcast his relationship with Cosmopolitan, because after he had left it the company had gone broke, which resulted, in the district judge's words, in "an explosion in the industry." But when Clifford filled out another panel data sheet at the AAA's request three years later, he again omitted any reference to his work at Cosmopolitan; and when the arbitration began and Clifford recognized Stern and realized that the president of Merit and the former executive vice-president of Cosmopolitan were one and the same, he had said nothing.

Leatherby argues that by failing at each of these junctures to disclose his former relationship with Stern, Clifford violated the ethical norms applicable to arbitrators, and that the only effective sanction for such a violation is to set aside the arbitration award. It also argues that Clifford did more than just fail to disclose his former relationship with Stern, that he tried to put Leatherby off the scent by calling Stern "Mr. Stern" rather than calling him by his first name; but there is no evidence that Clifford was doing anything other than maintaining the decorum of the arbitration proceeding.

The panel data sheet that the American Arbitration Association requires prospective arbitrators to fill out does not indicate that the information sought is for the purpose of determining whether grounds for disqualification exist, so no significance can be attached to Clifford's initial omission of his job history with Cosmopolitan. But section 18 of the AAA's Commercial Arbitration Rules requires the neutral arbitrator to "disclose to the AAA any circumstances likely to affect his impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their counsel." And Canon IIA of the Code of Ethics for Arbitrators in Commercial Disputes (jointly adopted by the American Arbitration Association and the American Bar Association) requires arbitrators to disclose "any existing or past financial, business, professional, family or social relationships which are likely to affect impartiality or which might reasonably create an appearance of partiality or bias." The requirement of disclosure is a continuing one, so the fact that Clifford's failure to disclose his relationship with Cosmopolitan in his first panel data sheet was innocent could not excuse his later failure to disclose the relationship when he accepted appointment as an arbitrator of the Merit-Leatherby dispute and when he recognized Stern on the first day of the arbitration hearing.

Notwithstanding the broad language of section 18, no one supposes that either the Commercial Arbitration Rules or the Code of Ethics for Arbitrators requires disclosure of every former social or financial relationship with a party or a party's principals. The Code states that its provisions relating to disclosure "are intended to be applied realistically so that the burden of detailed disclosure does not become so great that it is impractical for persons in the business world to be arbitrators, thereby depriving the parties of the services of those who might be best informed and qualified to decide particular types of cases." Quoting from Justice White's concurring opinion in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150–52, 89 S.Ct. 337, 340–41, 21 L.Ed.2d 301 (1968)—of which more anon—the Code states that although "arbitrators 'should err on the side of disclosure' ..., it must be

recognized that 'an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people' [so that] an arbitrator 'cannot be expected to provide the parties with his complete and unexpurgated business biography,' . . . [or] to disclose interests or relationships which are merely 'trivial.' "

The ethical obligations of arbitrators can be understood only by reference to the fundamental differences between adjudication by arbitrators and adjudication by judges and jurors. No one is forced to arbitrate a commercial dispute unless he has consented by contract to arbitrate. The voluntary nature of commercial arbitration is an important safeguard for the parties that is missing in the case of the courts. See *Corey v. New York Stock Exchange,* 691 F.2d 1205, 1210 (6th Cir.1982). Courts are coercive, not voluntary, agencies, and the American people's traditional fear of government oppression has resulted in a judicial system in which impartiality is prized above expertise. Thus, people who arbitrate do so because they prefer a tribunal knowledgeable about the subject matter of their dispute to a generalist court with its austere impartiality but limited knowledge of subject matter. "The professional competence of the arbitrator is attractive to the businessman because a commercial dispute arises out of an environment that usually possesses its own folkways, mores, and technology. Most businessmen interviewed contended that commercial disputes should be considered within the framework of such an environment. No matter how determinedly judge and lawyer work to acquire an understanding of a given business or industry, they cannot hope to approximate the practical wisdom distilled from 30 or 40 years of experience." American Management Ass'n, Resolving Business Disputes 51 (1965).

There is a tradeoff between impartiality and expertise. The expert adjudicator is more likely than a judge or juror not only to be precommitted to a particular substantive position but to know or have heard of the parties (or if the parties are organizations, their key people). "Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it. . . ." *Andros Compania Maritima, S.A. v. Marc Rich & Co.,* 579 F.2d 691, 701 (2d Cir.1978). The different weighting of impartiality and expertise in arbitration compared to adjudication is dramatically illustrated by the practice whereby each party appoints one of the arbitrators to be his representative rather than a genuine umpire. See Note, *The Use of Tripartite Boards in Labor, Commercial, and International Arbitration,* 68 Harv.L.Rev. 293 (1954). No one would dream of having a judicial panel composed of one part-time judge and two representatives of the parties, but that is the standard arbitration panel, the panel Leatherby chose—presumably because it preferred a more expert to a more impartial tribunal—when it wrote an arbitration clause into its reinsurance contract with Merit.

If Leatherby had wanted its dispute with Merit resolved by an Article III judge (to whom it had access under the diversity jurisdiction), it would not have inserted an arbitration clause in the contract, or having done so move for arbitration against Merit's wishes. Leatherby wanted something different from judicial dispute resolution. It wanted dispute resolution by experts in the insurance industry, who were bound to have greater knowledge of the parties, based on previous professional experience, than an Article III judge, or a jury. The parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen. Cf. *American Almond Products Co. v. Consolidated Pecan Sales Co.,* 144 F.2d 448, 451 (2d Cir.1944) (L. Hand, J.).

It is no surprise, therefore, that the standards for disqualification in the Commercial Arbitration Rules and the Code of Ethics for Arbitrators are not so stringent as those in the federal statutes on judges, see, e.g., 28 U.S.C. § 455, or in Canons 2 and 3(C) of the Code of Judicial

Conduct for United States Judges and the ABA's Code of Judicial Conduct. (In fact the arbitration rules and code do not contain any standards for disqualification as such, though such standards are implicit in the disclosure requirements of the AAA's Rules and the AAA–ABA Code.) We thus do not agree with Leatherby that the test for disqualification here is whether the former relationship between Stern and Clifford was "trivial" in relation to the subject matter of the arbitration. If it were trivial Clifford would not have had to disqualify himself even if he had been a judge. See, e.g., *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982); *United States Fidelity & Guaranty Co. v. Lawrenson*, 334 F.2d 464, 466 (4th Cir.1964); Interim Advisory Committee on Judicial Activities, Advisory Opinion No. 11 (Jan. 21, 1970), in Code of Judicial Conduct for United States Judges at p. II–26 ("It cannot be that [law] firms are precluded from practice before judges simply because members have judges for friends. Here again there may be special circumstances dictating disqualification, but a friendly relationship is not sufficient reason in itself").

Maybe it was trivial. *Chitimacha* held that a district judge did not have to disqualify himself from a case in which the defendant was a corporation that the judge had represented when he was in private practice, since the representation had terminated at least six years before. That was a professional relationship, like Clifford's with Stern—only a more recent one. But the test in this case is not whether the relationship was trivial; it is whether, having due regard for the different expectations regarding impartiality that parties bring to arbitration than to litigation, the relationship between Clifford and Stern was so intimate—personally, socially, professionally, or financially—as to cast serious doubt on Clifford's impartiality. Although Stern had been Clifford's supervisor for two years and was a key witness in an arbitration where the stakes to the party of which he was the president and principal shareholder were big, their relationship had ended 14 years before, Clifford had no possible financial stake in the outcome of the arbitration, and his relationship with Stern during their period together at Cosmopolitan had been distant and impersonal. The fact that they had never socialized, either while working for the same company or afterward (though both were practicing law in Chicago all this time), indicates a lack of intimacy. And when a former employee sits in judgment on a former employer there is no presumption that he will be biased in favor of the former employer; he may well be prejudiced against him. The fact that Clifford passed his lie-detector test with flying colors might have made him grateful to Stern, or might have fanned the flames of outrage at having been subjected to such an indignity, or more likely made no difference at all because it happened so long ago. Time cools emotions, whether of gratitude or resentment.

Section 18 of the Commercial Arbitration Rules makes the AAA itself the final arbiter of disqualification once the arbitrator has been appointed, subject only (so far as relevant here) to the limited judicial review allowed by section 10 of the Arbitration Act, 9 U.S.C. § 10, after an arbitration award is made and judicial confirmation of it sought. On the basis of the facts reviewed above, considered in the light of the less stringent standards applicable to disqualification of arbitrators than to disqualification of judges, we doubt that the AAA would have disqualified Clifford—or that Leatherby would have wanted it to.

But even if the failure to disclose was a material violation of the ethical standards applicable to arbitration proceedings, it does not follow that the arbitration award may be nullified judicially. Although we have great respect for the Commercial Arbitration Rules and the Code of Ethics for Arbitrators, they are not the proper starting point for an inquiry into an award's validity under section 10 of the United States Arbitration Act and Rule 60(b) of the Federal Rules of Civil Procedure. The arbitration rules and code do not have the force of law. If Leatherby is to

get the arbitration award set aside it must bring itself within the statute and the federal rule. The statute specifies limited grounds for setting aside an arbitration award. The only one relevant here is, "Where there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(b). (Leatherby does not argue that the award can be set aside on any other ground in the statute, such as "misbehavior" of an arbitrator, in section 10(c).) This is strong language. It makes the grounds for setting aside an arbitrator's award because of bias narrower than the grounds for disqualification in the arbitration rules and code, not to mention the statutes and ethical codes pertaining to judges. Read literally, section 10(b) would require proof of actual bias ("evident partiality"). And not only the arbitrator appointed by Merit, as one might expect, but also the arbitrator appointed by Leatherby—a member of a distinguished Chicago law firm—gave a detailed affidavit denying absolutely and in detail that Clifford had ever evinced any partiality during the three years of the arbitration.

Of course actual bias might be present yet impossible to prove; Clifford might have given no indication of his vote yet have been irrevocably committed to Merit out of some obscure sense of gratitude toward, or exaggerated respect for, Stern. If circumstances are such that a man of average probity might reasonably be suspected of partiality, maybe the language of section 10(b) can be stretched to require disqualification. But the circumstances must be powerfully suggestive of bias, and are not here.

█ The American Arbitration Association is in competition not only with other private arbitration services but with the courts in providing—in the case of the private services, selling—an attractive form of dispute settlement. It may set its standards as high or as low as it thinks its customers want. The statute has a different purpose—to make arbitration effective by putting the coercive force of the federal courts behind arbitration decrees that af-

fect interstate commerce or are otherwise of federal concern. See 9 U.S.C. § 1; S.Rep. No. 536, 68th Cong., 1st Sess. 3 (1924). The statute does not provide a dispute settlement mechanism; it facilitates private dispute settlement. The standards for judicial intervention are therefore narrowly drawn to assure the basic integrity of the arbitration process without meddling in it. Section 10 is full of words like corruption and misbehavior and fraud. The standards it sets are minimum ones. The ethical concerns expressed by Leatherby are remote from the draftmen's concerns. The Senate Report, for example, refers approvingly to " 'arrangements for avoiding the delay and expense of litigation and referring a dispute to friends . . . .' " S.Rep. No. 536, *supra,* at 3. The fact that the AAA went beyond the statutory standards in drafting its own code of ethics does not lower the threshold for judicial intervention. If Clifford violated current ethical norms for commercial arbitrators, his was at worst a technical violation that does not justify setting aside an arbitration award on the statutory ground of evident partiality or corruption. Concern with professional reputation will provide some deterrent to such violations, especially where the arbitrator is a lawyer, as he was here.

We have discussed the issue of the award's validity as if it had to be decided on the basis of first principles—as it very largely does. Prior cases involve factual situations very different from the one here and do not yield general principles. The only Supreme Court decision, *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), provides little guidance because of the inability of a majority of Justices to agree on anything but the result. Justice Black, joined by three other Justices, took a very hard line on the ethical standards of arbitrators. His opinion contains language suggesting that arbitrators are subject to the same ethical standards as judges, although this is dictum because the facts of the case required disqualification even under a narrow reading of section 10(b): the "neutral" arbitrator was a regu-

lar supplier of one of the parties to the arbitration, and had even rendered services on projects involved in the arbitration. Justice White, concurring, purported to join Justice Black's opinion but actually took a quite different tack, the sense of which is captured in the passages we quoted earlier from the Code of Ethics for Arbitrators—which treats Justice White's opinion as a surer guide to the view of a majority of the Supreme Court than Justice Black's. Justice White stated, "The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges," 393 U.S. at 150, 89 S.Ct. at 340, and since his vote was essential to a majority, what he said the Court did not decide the Court did not decide, whatever Justice Black may have hoped. Our court, in *United States Wrestling Federation v. Wrestling Division of AAU, Inc.*, 605 F.2d 313, 319 (7th Cir.1979), treated Justice White's opinion as authoritative.

■ Although it is difficult to extract from the cases more than a mood, the mood is one of reluctance to set aside arbitration awards for failure of the arbitrator to disclose a relationship with a party. See, e.g., *Andros Compania Maritima, S.A. v. Marc Rich & Co., supra*, 579 F.2d at 700. In *Andros*, the arbitration award was confirmed although the neutral arbitrator, Nelson, had not disclosed that he had in the recent past sat on 19 arbitration panels with the president of one of the firms involved in the arbitration and in 12 of these panels the president had been one of the arbitrators who had selected Nelson to be the neutral. Disqualification of the neutral arbitrator was also rejected in *International Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548, 551 (2d Cir.1981), even though, during the arbitration, he had been a witness in another case between the same law firms that were trying the arbitration matter before him. In *Middlesex Mutual Ins. Co. v. Levine*, 675 F.2d 1197 (11th Cir.1982) (per curiam), an arbitration award was set aside for "evident partiality," but there a company owned by the neutral arbitrator's family was entangled in a dispute with the parties to the litigation in which he personally had

lost $85,000, and he also was under investigation for alleged unethical conduct involving those parties.

■ The suggestion in *Tamari v. Bache Halsey Stuart Inc.*, 619 F.2d 1196 (7th Cir. 1980), that "appearance of bias" is a proper standard for disqualification of arbitrators is not inconsistent with anything in our present opinion; it just means that it is unnecessary to demonstrate—what is almost impossible to demonstrate—that the arbitrator had an actual bias. The standard is an objective one, but less exacting than the one governing judges.

■ Finally, it is significant that the issue of disqualification was raised here by a Rule 60(b) motion to set aside the award, filed some 18 months after the award had been issued by the arbitration panel (though only six months after it was confirmed by the district court). We asked Leatherby's counsel at oral argument whether he thought it would make a difference in this case if the Rule 60(b) motion had come 10 years after the award, with everything else in the case remaining the same. He said it would not. The framers of Rule 60(b) set a higher value on the social interest in the finality of litigation. A motion under Rule 60(b) seeks an extraordinary remedy, *DiVito v. Fidelity & Deposit Co. of Maryland*, 361 F.2d 936, 938 (7th Cir.1966), especially where as in this case the motion is based on the catch-all provision of Rule 60(b), Rule 60(b)(6) ("any other reason justifying relief from the operation of the judgment"). *Ackermann v. United States*, 340 U.S. 193, 200, 71 S.Ct. 209, 212–13, 95 L.Ed. 207 (1950); *Stradley v. Cortez*, 518 F.2d 488, 493 (3d Cir.1975); *Naxon Telesign Corp. v. GTE Information Systems, Inc.*, 89 F.R.D. 333, 337 (N.D.Ill. 1980); 11 Wright & Miller, Federal Practice and Procedure § 2857, at p. 160 (1973). (Leatherby does not argue that Merit's failure to disclose Stern's former relationship with Clifford was fraud under Rule 60(b)(3).) To make out a case for relief from judgment under Rule 60(b)(6) Leatherby had to show not only that an arbitra-

tor had violated the ethical and legal standards for arbitrators but that the violation created a substantial danger of an unjust result.

It failed to show this. Its counsel conceded at oral argument that his client would be bound to submit to a new arbitration proceeding if the award were set aside. But in the old proceeding Leatherby's own arbitrator voted against it. If we may believe that arbitrator's affidavit—and there is no reason not to—he did not regard this as a close case. According to the affidavit, both he and Merit's arbitrator pushed Merit's case harder than Clifford did. We need not decide whether Clifford was bending over backwards to avoid showing partiality toward Merit in view of his former relationship with Stern or whether, as the affidavits and his own testimony suggest, he is of a retiring disposition and had less experience in the subject matter of the arbitration than the other two arbitrators. It is enough to note that rerunning the arbitration before a different panel is unlikely to change the outcome.

Furthermore, as it is likely that if Leatherby had known about Clifford's former relationship with Stern it would not have cared, because it would not have been able to figure out any more than we can how that relationship would cut in terms of partiality toward or prejudice against Merit, we think Leatherby was required, and it failed, to support its Rule 60(b) motion with affidavits that its officers did not know of the relationship. It had to negate any inference that it had implicitly consented to have Clifford as an arbitrator knowing all it now knows but saying nothing. We note in this regard the perfunctory investigation that Leatherby made into Clifford's background when the AAA first listed him as a possible arbitrator. Leatherby argues that it would have been burdensome to investigate all 26 names on the list and that it was entitled to trust any potential arbitrator to comply with the AAA's disclosure requirements. It points out that the cost of arbitration will be increased if parties, not being able to trust the disclosure requirements, must conduct elaborate background investigations. It is true that the disclosure requirements are intended in part to avoid the costs of background investigations. But this is a $10 million case. If Leatherby had been worried about putting its fate into the hands of someone who might be linked in the distant past to the adversary's principal, it would have done more than it did to find out about Clifford. That it did so little suggests that its fear of a prejudiced panel is a tactical response to having lost the arbitration.

We do not want to encourage the losing party to every arbitration to conduct a background investigation of each of the arbitrators in an effort to uncover evidence of a former relationship with the adversary. This would only increase the cost and undermine the finality of arbitration, contrary to the purpose of the United States Arbitration Act of making arbitration a swift, inexpensive, and effective substitute for judicial dispute resolution. This lawsuit is already eight years old. To uphold the district court's vacation of the arbitration award in the absence of evidence of actual or probable partiality or corruption would open a new and, we fear, an interminable chapter in the efforts of people who have chosen arbitration and been disappointed in their choice to get the courts—to which they could have turned in the first instance for resolution of their disputes—to undo the results of their preferred method of dispute resolution.

The judgment of the district court setting aside his earlier judgment confirming the arbitration award in favor of Merit is reversed, and the case is remanded with directions to reinstate the previous judgment.