NORTHWESTERN NATIONAL
INSURANCE COMPANY,
Petitioner,

v.

ALLSTATE INSURANCE COMPANY,
Respondent.

No. 88–C–480.

United States District Court,
E.D. Wisconsin.

Sept. 13, 1993.

---

Richard C. Ninneman, Quarles & Brady, Milwaukee, WI, Lawrence I. Brandes, Miller, Singer, Raives & Brandes, New York City, for petitioner.

Jeffrey P. Lennard, John T. Grossbart, Sonnenschein, Nath & Rosenthal, Chicago, IL, Thomas G. Cannon, O'Neill, Cannon & Hollman, Milwaukee, WI, for respondent.

## DECISION AND ORDER

RANDA, District Judge.

The above captioned case comes before the Court on cross-motions for summary judgment. Petitioner, Northwestern National Insurance Company ("NNIC"), seeks to vacate the award of an arbitration panel, contractually established by the parties, on the ground that the umpire of said panel, William Adams ("Adams"), displayed "evident partiality" as set forth in subsection (a) of the United

States Arbitration Act of 1925 (codified at 9 U.S.C. § 10).[1] Specifically, NNIC charges that Adams had an indirect, non-pecuniary stake in the outcome of the case that cast doubt upon Adams' impartiality. In addition to receiving this "benefit", Adams' failure to disclose the actions and the relationships that produced this "benefit" requires vacation of the award. Adams' impartiality is attacked, therefore, on two grounds. First, the indirect non-pecuniary benefit ("enhancement") he would receive from the ruling he rendered, and second, his failure to disclose the relationship that provided the basis for such benefit.

Because the Court finds that this indirect non-pecuniary benefit [and/or the non-disclosure of the circumstances that could produce said benefit] creates so little inducement for bias, NNIC's motion to set aside the award on these grounds is denied and Allstate's motion for summary judgment is granted.[2]

## FACTUAL BACKGROUND

### 1. Undisputed Facts

Allstate and NNIC have submitted proposed Findings of Fact and Responses pursuant to Local Rule 6.05. In 1983, NNIC and Allstate entered into a series of reinsurance contracts, (collectively the "Treaties") pursuant to which Allstate agreed to reinsure a portion of NNIC's obligations on certain financial guaranty bonds ("Bonds") issued to investors in various tax shelter investment programs.[3] As a result of disagreements between NNIC and Allstate regarding the construction and interpretation of a number of specific exclusions and limitations in the Treaties, the parties proceeded to arbitration in January, 1988, at NNIC's request. (Petition, Exh. H) Pursuant to the Arbitration Clause, each party selected an arbitrator[4],

---

1. By consent of Court and Counsel, the "evident partiality" issue will be decided first.

2. The Court, by telephone, previously notified the parties of the disposition of these cross-motions.

3. The six re-insurance contracts between NNIC and Allstate encompassed a financial guarantee bond program established by NNIC pursuant to which NNIC issued surety bonds to secure the obligations of investors in tax shelters and All-

state assured a portion of NNIC's risk (and premiums) through the re-insurance contracts. (Allstate's Proposed Finding No. 5; Petition, ¶¶ 6, 9, 10; Exhs. B, C, E, F, and G).

4. Each party was to select an arbitrator and then these arbitrators were to agree on the selection of an Umpire. Only "active or retired disinterested officials of insurance, or reinsurance companies" were eligible. (Allstate's Proposed Finding No. 8; Petition, Exh. C, E ¶ 20)

and these arbitrators (NNIC selected Vincent Schuster; Allstate selected Dennis Layne) in turn, selected Adams as the Umpire.[5] (Allstate's Memo. at 4; Allstate's Proposed Finding No. 10) The NNIC–Allstate Arbitration Hearing was conducted from January 5–8, 1988. (Allstate's Proposed Finding No. 11) The Panel members deliberated from February 1–4, 1988, culminating in the issuance of a unanimous Award on February 4, 1988. (Allstate's Proposed Finding No. 14).[6]

Between the conclusion of the Arbitration Hearing and the issuance of the Award, Adams was interviewed on January 26, 1988, by attorneys representing his former employer, Skandia America Reinsurance Corporation ("Skandia"). (Allstate's Proposed Finding No. 22) Skandia's attorneys (Lebouef, Lamb, Leiby & MacRae) were investigating a program originated by Admiral Insurance Company and reinsured, in part, by Skandia. The Admiral/Skandia Treaties.) NNIC and Allstate were not involved with any aspect of the Admiral Program or its reinsurance. (Allstate's Proposed Finding No. 18) Adams formerly headed the Bond Department at Skandia and was involved in setting up the Admiral/Skandia Treaties. (Allstate's Proposed Finding No. 18) He had extensive experience in the reinsurance of surety bonds. (NNIC's Proposed Finding No. 18) Adams failed to disclose the January 26, 1988, meeting or these associations to the parties or the other arbitrators, though all were aware of his extensive experience and background in the industry. (NNIC's Memo. at 10; NNIC's Proposed Finding No. 36; Allstate's Response to NNIC's Proposed Finding No. 36; Allstate's Proposed Finding No. 25; Layne Dep. 7–11, 34–35, 39–40; Schuster Dep. 7–10, 14) The parties agree that a showing of actual bias is not required

to demonstrate "evident partiality". (NNIC's Reply at 7; Allstate's Reply at 1–2).[7] Based on the record presented, the Court concludes that Adams did not manifest the necessary bias for Allstate or against NNIC at the Hearing or during deliberations.

### 2. Disputed Facts

NNIC's factual objections center around four areas: First, Allstate's alleged ignoring of the commonality between the NNIC/Allstate treaties and the Admiral/Skandia treaties. Second, the direct involvement of Adams in securing Skandia's participation in the re-insurance program with Admiral. (Allstate, however, only disagrees to the extent that "other" executives may have been involved.) (Allstate's Response to NNIC's Proposed Finding No. 26) Third, Allstate's failure to recognize the extent of Adams' discussion with Skandia attorneys about the potential Admiral dispute at the January 26, 1988, meeting. (NNIC's Proposed Findings Nos. 20–25; Allstate's Response to NNIC's Proposed Finding No. 30) Fourth, failures by Allstate to recognize substantial similarities between the NNIC/Allstate disputes and Admiral/Skandia disputes that were known by Adams at the time of the January 26, 1988 meeting and during the arbitration.

Allstate's factual objections to NNIC's proposed facts basically follow and contradict the objections of NNIC. First, Allstate argues that the Admiral/Skandia program is different in many significant aspects from that of the NNIC/Allstate program. (Allstate's Response to NNIC's Proposed Finding No. 35) Second, that there was not a known potential loss of Seventy Million Dollars in 1987 or on June 28, 1988, arising from the Admiral dispute. (Allstate's Response to NNIC's Proposed Finding No. 27) NNIC concedes that the amount of the loss was not

---

5. In fact, NNIC's designated arbitrator, Mr. Schuster, first proposed William Adams as Umpire. Allstate, through its arbitrator Mr. Layne, subsequently agreed to that selection. (Allstate's Proposed Finding No. 10) A fact not disputed by NNIC. (NNIC's Response to Allstate's Proposed Finding No. 10 at p. 4).

6. NNIC objects to Allstate's Proposed Finding No. 14. by noting that the Court's Order of January 3, 1988 found that the Award was signed on

February 4, 1988, but was not "delivered" until February 8, 1988. (NNIC's Response to Allstate's Proposed Finding No. 14) This does not represent a dispute of material fact.

7. NNIC has argued, however, that Adams' conduct displayed actual bias. (NNIC's Memo. at 27–28; NNIC's Reply at 18) In addition, NNIC appears to suggest that the *entire panel* acted in a biased fashion. (NNIC's Reply at 18 and note 9)

known in 1987. (NNIC's Reply to NNIC's Proposed Finding No. 27) Third, the Admiral dispute did not exist in 1987, nor at the time of the January 26, 1988, meeting. (Allstate's Response to NNIC's Proposed Finding No. 27) Fourth, the NNIC/Allstate and Admiral/Skandia disputes are substantially different. (Allstate's Memo. at 8; Allstate's Proposed Finding No. 21).

### FINDINGS OF FACT

NNIC asks the Court not to "purge ... relevant facts and make a decision on a 'fragmentary record'", (NNIC's Response to Allstate's Findings of Fact at p. 2), but because the so-called disputed facts do not rise to the level of "material" facts, the Court can decide this issue as a matter of law. *Anderson, infra* p. 1284. NNIC has argued that the NNIC/Allstate Treaties and Admiral/Skandia Treaties were similar (NNIC's Memo. at 5–8) As to the "commonality" of the NNIC/Allstate Treaties and the Admiral/Skandia Treaties, the Court finds for the record that there were similarities and there were differences, the sum of which does not significantly impact on this Decision and Order.

As to the similarities/differences between the NNIC/Allstate dispute and the Admiral/Skandia dispute, the Court must accept Adams' characterization that they were "a similar type situation". (Adams Dep. 101–02.)

As to the January 26, 1988, meeting, the Court finds that this was a preliminary investigation by counsel for Skandia into the potential dispute that loomed with Admiral Insurance. Further, what was discussed, based on the record, does not suggest a comparison of the NNIC/Allstate and Admiral/Skandia programs or disputes. (Sandza Dep. 25–30, 32–35, 62–71; Lopatto Dep. 14–19; Minissale Dep. 24–25, 36–40; Adams Dep. 81–83, 129–133, 175–176) The meeting, looked at in a light most favorable to NNIC, does not suggest a thorough understanding by Adams of the future Admiral/Skandia dispute.

Lastly, the Admiral/Skandia dispute can only be characterized as a "potential" dispute in 1987. (Allstate's Response to NNIC's Proposed Finding No. 27)

What emerges from these submitted "facts", looked at in a light most favorable to NNIC, is the following: Adams, the "neutral" arbitrator selected by the two sides had substantial prior connections with Skandia (engaged in the reinsurance business). Skandia was a non-party in this case, but a *potential party to a possible, future, separate,* but similar dispute involving Admiral. Adams was employed by Skandia throughout the 1980's and was responsible for involving Skandia in a re-insurance program with Admiral "similar" to the one involving the parties in this case. Skandia had stopped some payments to Admiral and was contemplating what it ultimately did in June of 1988; request arbitration. The Admiral program involved guarantee bonds that amounted to millions of dollars, and Adams became aware of the "potential" dispute between Admiral and Skandia on January 26, 1988. (Adams' Dep. 175–176)

After the meeting of January 26, 1988, Adams failed to disclose to NNIC or Allstate or to the other arbitrators that he had met with Skandia's attorneys and had become aware of a potential similar dispute involving his former employer. (Allstate's Proposed Finding No. 25; NNIC's Response to Allstate's Proposed Finding No. 25; NNIC's Memo. at 10; NNIC's Proposed Finding No. 36; Allstate's Response to NNIC's Proposed Finding No. 36) As it turns out, his then current employer [8], International Credit, also became involved in the Admiral dispute when arbitration was requested by Skandia in June of 1988 because International Credit was a partial re-insurer of Admiral.

### LEGAL ANALYSIS

#### A. SUMMARY JUDGMENT

■ Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on

---

**8.** Allstate objects to the use of the word "employed" as applied to Adams by arguing that Adams was simply "retained" by International Credit. (Allstate's Response to NNIC's Proposed Finding No. 19) The Court accepts, for purposes of this record, Allstate's definition of "employ".

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

## B. DISCUSSION

■ First, it is clear that the burden rests upon NNIC to show grounds for vacation of an arbitration award. "[T]he party challenging an arbitral award has the burden of proving the existence of grounds to vacate". *Sun Refining & Marketing Co. v. Statheros Shipping Corp.*, 761 F.Supp. 293, 298 (S.D.N.Y.1991), citing *Saxis Steamship Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir.1967). Equally clear is the standard that Courts are hesitant to overturn arbitration awards. "Courts are reluctant to set aside an award based on a claim of evident partiality and will do so only if bias of the arbitrator is direct and definite; mere speculation is not enough". *Sofia Shipping Co. v. Amoco Transport Co.*, 628 F.Supp. 116, 119 (S.D.N.Y.1986); *See also, Teamsters, Chauffeurs, etc. v. E.D. Clapp Corp.*, 551 F.Supp. 570, 577 (N.D.N.Y.1982) ("... an award will not be vacated on the grounds of evident partiality of the arbitrator unless the conduct of the arbitrator was so biased and prejudiced as to destroy fundamental fairness.") As the Seventh Circuit stated in *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 681 (7th Cir.), *cert. denied*, 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983), "[t]he standards for judicial intervention are narrowly drawn to assure the basic integrity of the arbitration process without meddling in it." [9]

### 1. The Potential Benefit to Adams

■ Adams' evident partiality is allegedly established by the benefit that he could expect to receive from the Panel's ruling. The nature of the benefit, as argued by NNIC, was an "enhanced" status in the industry or an "enhanced" position with his former and current employers. In essence he had a "reputational" interest in the ruling. In turn, this benefit or reputational enhancement would accrue because the ruling *might* result in a favorable outcome for his ex-employer in a *possible future* dispute. For reasons subsequently discussed, such a benefit is so minor (if not non-existent) and evinces so little tendency to bias that "evident partiality" is not shown.

NNIC not only argues that Adams had a "stake in the outcome of that dispute"

9. NNIC has argued that the issue of "evident partiality" is to be governed by Wisconsin law. (NNIC's Memo at 14; Reply at 2). In support thereof NNIC cites the Petition, Exh. B, D ¶ 23(d); Exh. C, E ¶ 22(d) which provides that the Treaties shall be "governed in interpretation, construction, and administration by the laws of the State of Wisconsin". Allstate has referred to this as "NNIC's eleventh hour attempt to cloud the issue. If NNIC is attempting to raise a question as to what law was intended by the parties to apply to actions to vacate the Award, as distinguished from construing the Treaties, that intent is plainly set forth in the pleadings filed by NNIC (and also Allstate) over the last five years properly delineating § 10(a) as the applicable standard." (Allstate's Memo. at 13, n. 4) The importance of this disagreement, at least for purposes of this Decision and Order, is seriously lessened by NNIC's repeated acknowledgment that Wisconsin law and federal law are "uniform[]", "virtually ... identical", "closely tracks", and are "similar". (NNIC's Memo. at 14–15) To the extent that NNIC cites Wisconsin law for what it hopes is more expansive language (*See* NNIC's Memo. at 15 citing *Richco Structures v. Parkside Village, Inc.*, 82 Wis.2d 547, 263 N.W.2d 204 (1978), the Court is not persuaded that its application requires vacatur of the Award.

(NNIC's Memo. at 24–25) but "an incalculable personal stake" in the resolution of the Admiral dispute: "If Admiral's reinsurers were held liable for a monumental share of the liability on a failed program ... Skandia and International Credit (along with countless others in the tightly knit reinsurance industry) would surely remember for a long, long time that it was Adams who had personally committed Skandia's assets to that program in the first place. Conversely, if the reinsurers were absolved of liability on the Admiral Treaties, it is somewhat of an understatement to suggest that Adams' status within that family of insurance companies—and his reputation generally—would "be enhanced" by that result." (*Id.*)

What NNIC has shown is nothing more than what the Court has characterized as a "reputational" interest in the outcome of the arbitration. This is significantly less than what was shown in *Sidarma Societa Italiana di Armamento Spa v. Holt Marine Industries, Inc.*, 515 F.Supp. 1302 (S.D.N.Y.1981).[10] Adams' "reputational" interest is less of an inducement to bias than the "commercial" interest *permitted* in *Sidarma*:

> It may even be that, in considering the well-being of the industry generally, the arbitrator will perceive some future benefit to his or her personal business ventures that may result from the precedent established by the arbitration award. This alone, however, does not constitute the evident partiality Sec. 10(b) requires before an arbitration award can be disturbed. To set aside an award for arbitrator partiality, *"the interest or bias ... must be direct, definite, and capable of demonstration*

*rather than remote, uncertain, or speculative."* (emphasis ours)

*Id.* at 1307.

Adams' reputational interest is inherently insubstantial, and the fact that it is merely a potential and future benefit, makes it "remote, uncertain, and speculative".[11]

NNIC relies chiefly on *Sun Refining, supra*, to support its "reputational enhancement" claim. *Sun Refining*, "... involved an arbitration in which the umpire had a principal role—albeit no financial stake—in another dispute which was in arbitration." (NNIC's Memo. at 17) From this NNIC argues that even if the umpire's stake in another dispute is indirect and completely nonpecuniary, as long as the arbitrator's status could somehow "be enhanced" by the outcome of that other dispute evident partiality can be shown. (NNIC's Reply at 19–20) However, an analysis of *Sun Refining* reveals that the umpire had what must be characterized as a **direct adversarial relationship** with a party to the arbitration before him; a fact which serves to distinguish it from the case at bar.[12] *Sun Refining*, therefore, does not support the principle NNIC seeks to advance.

### 1. Failure to Disclose

The Seventh Circuit, in *U.S. Wrestling Federation v. Wrestling Division of AAU, Inc.*, 605 F.2d 313, 318–319 (7th Cir.1979)[13] "endeavor[ing] to lay down a few general guidelines", approvingly cited both the Supreme Court's decision in *Commonwealth Coatings Corp. v. Continental Casualty Co.*,

---

10. In *Sidarma*, the District Court refused to vacate an award despite the following correspondence among two panel members, "... [W]e agreed unanimously not to pierce the corporate veil because the "Corporate Veil" concept is a vital part of our industry and should not be jeopardized by the activities of Mr. Holt, et al (defendants), I feel a finding that a joint venture existed in this case would jeopardize our industry even more." *Id.* at 1306.

11. Because *every award* enhances the status of the arbitrator in the estimation of *some* employer, it is difficult to conceive of an award which would not be vacated under NNIC's argued standard.

12. In *Sun Refining*, the court vacated the award because the challenged umpire on the Sun/Statheros panel was the President of the agent corporation for the Fritzen Group of Germany which was *contemporaneously* involved in arbitration with Sun Refining. *Id.* at 294–95.

13. In adopting these guidelines, the Seventh Circuit noted that the "infinite number of possibilities of claims for some connective basis for disqualification" require "case-by-case" examination with "unfortunate connotations". *U.S. Wrestling* at 318. The result being that arbitration awards drag on for months, "if not years, ... frustrat[ing] the salutary purpose of arbitration." *Id.*

393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) and an Illinois state case, *William B. Lucke, Inc. v. Spiegel,* 131 Ill.App.2d 532, 266 N.E.2d 504 (1970). *U.S. Wrestling* declined to set aside an award for "evident partiality" where the panel chairman's law firm had an ongoing attorney-client relationship with Northwestern University which, in turn, was tangentially related to a party. While the facts of the case are complex, *U.S. Wrestling* provides an illustrative discussion of bias and the requirements of disclosure. From *Lucke* the Seventh Circuit accepted as a "guiding principle" the following: "[t]he interest or bias of an arbitrator must be direct, definite, and capable of demonstration rather than remote, uncertain, or speculative." (citation omitted) *U.S. Wrestling* at 318. With respect to disclosure, the Seventh Circuit cited the Supreme Court's decision in *Commonwealth Coatings, supra* at 150, 152:

> * * * [A]rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, *or if they are unaware of the facts but the relationship is trivial.* ... He cannot be expected to provide the parties with his complete and unexpurgated business biography.

*U.S. Wrestling* at 319.

Of particular importance to this Court's Decision and Order is the Seventh Circuit's summation of *Lucke* and *Commonwealth Coatings:*

> To embark upon disclosing relationships with non-parties who in turn might have relationships with a party particularly when many non-parties had similar rela-

tionships would be 'to provide the parties with his complete and unexpurgated business biography', (citation omitted) on the remote and speculative chance that there was some disqualifying connection.

*U.S. Wrestling* at 320.

Going beyond what was rejected in *U.S. Wrestling,* NNIC seeks to find "evident partiality" in Adams' failure to disclose prior and current (Skandia and International Credit respectively) relationships with non-parties who in turn had *no* relationship with either Allstate or NNIC.

■ An arbitrator's failure to disclose the fact that one of the parties to the arbitration was his former employer, was not fatal. *Merit,* 714 F.2d at 681–682. Judge Posner stated, "... the mood is one of reluctance to set aside arbitration awards for failure of the arbitrator to disclose a relationship *with a party.*" *Id.* at 682.[14] (emphasis added) Even though non-disclosure by the arbitrator was a violation of legal and ethical standards, it was not evidence of evident partiality. *Id.* at 681. Instead *Merit* hinged on the standard of whether or not the facts disclosed a "substantial danger of an unjust result". In other words, the arbitrator's inducement to bias had to be substantial and not merely remote, before the requirement of notice arose. "... [T]he circumstances must be *powerfully suggestive of bias* ...". *Id.* Adams' inducement to bias was minimal, and therefore there was no "substantial danger of an unjust result". He had no duty to disclose.[15]

## CONCLUSION

Because Adams' relationship with Admiral/Skandia was with a non-party to the arbi-

**14.** Judge Posner reasoned, "... when a former employee sits in judgment on a former employer there is no presumption that he will be biased in favor of the former employer; he may well be prejudice against him." *Merit* at 680. In light of Judge Posner's reasoning, consider that Adams did not "sit in judgment of a former employer" nor did he fail to disclose a relationship with a "party".

**15.** NNIC asserts two additional matters to raise doubts as to Adams' partiality and credibility. First, NNIC points to Adams' August 6, 1992 deposition, wherein he testified that he was "positive" the meeting with Skandia attorneys took place in the summer of 1988 (in fact the meeting

took place on January 26, 1988) and his subsequent revision only after the other three participants were deposed. It is difficult to conclude that Adams intentionally lied about the date of the meeting with the hope that the *other three participants* would not be deposed. Second, NNIC argues that Adams improperly billed the parties in the amount of $4,000 for work he did not perform during the period February 4–8, 1988. (NNIC's Reply at 22) The record is too sparse for the Court to decide whether Adams' did or did not perform the work. Nevertheless, it is difficult to see how this is evidence of *partiality* if *both* parties shared the bill.

tration, because the perceived benefit to Adams was indirect and non-pecuniary, and because said benefit would accrue only if significant future events occurred, (i.e. Admiral/Skandia went to arbitration on similar issues and that Panel used the NNIC/Allstate arbitration as precedent—even though it has no complete or certain precedential value) Adams' failure to disclose is of little significance.

That Adams may have been pre-committed to a particular substantive position (strongly argued by NNIC) or that he knew or had heard of the parties (in this case—non-parties) is far from fatal; it actually is to be expected. *Merit, supra,* at 679. Certainly the relationship that Adams had with the *parties* was not so intimate from a social, personal, professional or financial basis as to cast doubt upon his impartiality. But, NNIC again asks the Court to apply this standard to *non-parties*. Even applying this standard to the non-parties (i.e., Admiral/Skandia) the Court cannot find the necessary relationship on any level. In addition, it is also expected that Adams as an "expert" in the industry would have strong views on certain topics and that these strong views and familiarity with the discipline in question would come at the expense of complete impartiality. *Sun Refining* at 299.

The question that ultimately emerges from the facts and the law and that must be answered in the negative is the following: Applying the foregoing legal standards, would a reasonable person under the totality of the circumstances conclude that Adams (for the purpose of achieving the "benefit" of an enhanced status in the industry [16]) was partial to one party to this arbitration in order to potentially benefit a non-party in a possible similar future arbitration where his decision did not carry complete precedential value?

NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Northwestern National Insurance Company's motion for summary judgment is **DENIED**; and

2. Allstate Insurance Company's motion for summary judgment is **GRANTED**.

**SO ORDERED.**

---

16. We assume for the moment that Adams' status in the industry would be enhanced only by adopting one position in the arbitration. (*But see* n. 11)