# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3646

_____

|  |  |  |
|---|---|---|
| Delta Mine Holding Company;<br>Meadowlark, Inc., | * | |
| | * | |
| | * | |
| Appellants, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| AFC Coal Properties, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: June 14, 2001

Filed: December 28, 2001

_____

Before LOKEN, Circuit Judge, ROSENBAUM[*] and DAWSON,[**] District Judges.

_____

LOKEN, Circuit Judge.

Delta Mine Holding Company ("Delta Mine") petitioned the district court to confirm, and AFC Coal Properties, Inc. ("AFC"), petitioned the district court to vacate, two arbitration awards resolving disputes over Delta Mine's right to terminate

_____

[*]The HONORABLE JAMES M. ROSENBAUM, Chief Judge of the United States District Court for the District of Minnesota, sitting by designation.

[**]The HONORABLE ROBERT T. DAWSON, United States District Judge for the Western District of Arkansas, sitting by designation.

coal mining lease agreements. The district court vacated the awards because of the partiality and misconduct of the non-neutral arbitrator chosen by Delta Mine. Delta Mine appeals, raising difficult issues concerning how the grounds for vacating an award under the Federal Arbitration Act, 9 U.S.C. § 10(a)(1)-(3), should be applied to party-selected arbitrators. Delta Mine seeks confirmation of one award, and modification of the other to eliminate an offset provision favorable to AFC. AFC defends the district court's decision and also urges us to affirm on any of several alternative grounds not reached by the district court. We conclude that the conduct of Delta Mine's party arbitrator does not warrant vacating the awards. We further conclude that AFC's other arguments for vacating the awards, and Delta Mine's argument that one award should be modified, are without merit. Accordingly, we reverse and remand with directions to confirm both awards.

## I. BACKGROUND

In 1980, the predecessors of Delta Mine and AFC entered into long-term leases for the mining of coal on AFC lands in Illinois. The parties refer to these agreements as the Williamson County and the Saline County leases.[1] Complex provisions permitted Delta Mine to terminate each lease upon notice to AFC that all "Economically Recoverable Coal" had been mined. Paragraph 8.2 provided that disputes over this provision were subject to arbitration by a panel of three arbitrators, one selected by Delta Mine, one by AFC, "and a third selected by the other two arbitrators in accordance with the then applicable rules of the American Arbitration Association." Paragraph 8.3 provided that "each of the arbitrators . . . shall be a professional mining engineer, or firm of professional mining engineers," and that the

---

[1]The leases were signed by The Penn Central Corporation as lessor and by Meadowlark Farms, Inc., as lessee. Meadowlark was a subsidiary of AMAX Inc., a large diversified mining company,

third or neutral arbitrator may not be "an officer, employee or shareholder of, attorney or auditor to, or otherwise interested in" either party or the matter to be arbitrated.

In November 1995, Delta Mine invoked the termination provision in each lease. AFC objected, and these two arbitration proceedings followed. Delta Mine designated as its party arbitrator the consulting engineering firm of Stagg Engineering Services Inc. and its principal, Alan Stagg. AFC designated mining engineer Paul Jones. Stagg and Jones selected mining engineer John Wilson as the neutral arbitrator for the Williamson County arbitration and mining engineer Eugene Kitts as the neutral arbitrator for the Saline County arbitration.

The two arbitration panels held a joint organizational meeting on November 24, 1997, attended by the four arbitrators, the parties, and their attorneys. At the suggestion of arbitrator Jones, each arbitrator briefly described his background. Stagg stated that he had maintained a client consulting relationship with Delta Mine's predecessors since 1981, that he had never worked with Delta Mine's law firm, and that he had previously met the neutral arbitrators. There followed a discussion of when the hearings should be held. The neutral arbitrators overruled AFC's objection to joint proceedings, concluding that the two panels would hold a joint hearing on common issues, followed by separate hearings on issues unique to each arbitration. Delta Mine urged an expedited process -- informal exchanges of documents and witness statements followed by hearings in late January 1998. AFC argued for a more lengthy process, including formal document discovery and depositions "because they have all the information and they have all the witnesses." After the arbitrators conferred, neutral arbitrator Kitts announced the pre-hearing schedule -- document discovery during December and January, depositions during February, and the hearings during the week of March 23, 1998. Over AFC's strenuous objection, arbitrator Kitts ruled "that the two partial panel members [Stagg and Jones] should be in a position to ask the pertinent questions of the witnesses, rather than having it turn into a more formal judicial [proceeding] with cross-examinations and so forth."

Not surprisingly, the ambitious discovery schedule was later extended. On March 31, 1998, after deposing Delta Mine witnesses, AFC's counsel wrote the arbitrators complaining that Delta Mine's party arbitrator, Alan Stagg, had been present at Delta Mine's witness preparation and strategy sessions and was acting as Delta Mine's expert in preparing witnesses for depositions and the hearings. AFC expressed concern "whether an arbitrator who invests himself deeply in the preparation of a case, and then becomes the chief interrogator for his side at the hearing, can be reasonably expected to judge a case on its merits as called for by the *Code of Ethics for Arbitrators in Commercial Disputes*."[2] AFC concluded by requesting "a brief postponement of perhaps a few weeks, to a convenient date in May, to allow each side a reasonable opportunity to prepare."

On April 13, 1998, the two panels responded. In a letter ruling signed by each of the four, the arbitrators rescheduled the hearings to the first week in May. As a "compromise" between AFC's request for full attorney cross-examination of witnesses and the arbitrators' intent "that this arbitration should not become a formal judicial exercise," the panels ruled that only the arbitrators would be permitted to question witnesses during the presentation of their testimony, but the panels would receive follow-up questions, comments, and requests for clarification from counsel following each witness's presentation. (As the hearings later progressed, AFC's counsel was permitted to cross-examine Delta Mine's witnesses.)

The April 13 letter ruling did not address AFC's concern over Stagg's role in assisting Delta Mine with the preparation of its case. However, on April 8, AFC's party arbitrator, Paul Jones, had sent AFC's attorneys a long memorandum describing a two-hour meeting of the arbitrators. Jones reported:

---

[2]Hereinafter referred to as the "Code of Ethics." The Code of Ethics was prepared in 1977 by a joint committee of the American Arbitration Association and the American Bar Association.

**ROLE OF PARTY ARBITRATOR AT HEARING:** It was the opinion or expectation of the two Neutral Arbitrators that each Party Arbitrator would serve to question witnesses to bring out issues which were not clear in the witness presentations. To do this, the Neutrals expect the Party Arbitrator to be adequately briefed to know where the testimony is going and to be able to ask questions for clarification, etc. They did not seem 'taken back' by Alan Stagg's attendance at the prep sessions.

*   *   *   *   *

**[JONES] COMMENTS:** Gentlemen, I know you are not happy with the results of today's meeting but I am certainly willing to do what I can to make the hearing effective for your position. . . . I would suggest if you could Fed Ex to me (home delivery Saturday) as much material regarding the depositions, your expert witness concepts, etc. as possible. I can then spend this weekend and early next week reviewing the material. . . . If [the hearing] is not delayed, we need to discuss ASAP when I might be briefed on your side of the issues so that I can do a decent job in raising questions at the hearings.

Following the hearings, the two panels began their separate deliberations. In the district court, AFC conducted thorough discovery of party arbitrator Stagg, but neither party conducted discovery of party arbitrator Jones or the neutral arbitrators. Thus, the record provides a substantial but incomplete picture of the deliberations. We know that each neutral arbitrator discussed the issues with Stagg and Jones, prepared a draft award and circulated it to the party arbitrators for comment, and after further deliberations prepared the final award. Neutral arbitrator Wilson ruled that Delta Mine was entitled to terminate the Williamson County lease under the Economically Recoverable Coal provision but awarded AFC an offset based upon amounts Delta Mine had received from its coal customer for future mining royalties. Party arbitrator Stagg concurred in the termination ruling but dissented from the offset award, while party arbitrator Jones dissented from the termination ruling but concurred in the offset award. In the other arbitration, neutral arbitrator Kitts ruled

that Delta Mine was entitled to terminate the Saline County lease. Arbitrator Stagg concurred in this award; arbitrator Jones dissented.

AFC then petitioned the district court to vacate both awards. Delta Mine petitioned to confirm the Saline County award and to modify the Williamson County award. The district court vacated both awards based upon the following misconduct by Delta Mine's party arbitrator Stagg:

- Stagg's failure to fully disclose his substantial and ongoing relationship with Delta Mine and its attorneys, including his consulting relationship in these proceedings.

- The substantial role played by Stagg and his firm in helping Delta Mine prepare for the arbitration hearings, including Stagg's participation in a mock arbitration held days before the hearings.

- Stagg's disclosure of the ongoing panel deliberations to Delta Mine and his communications with Delta Mine and its attorneys concerning "how to sway the arbitrators to rule in Delta Mine's favor."[3]

Accepting AFC's view of the legal issues, the district court discussed at length how Stagg's conduct violated the Code of Ethics and then asserted in conclusory fashion that such misconduct justified vacating the awards under § 10(a) of the Federal Arbitration Act. On appeal, Delta Mine argues that the district court erred in placing

---

[3]Stagg communicated with Delta Mine's counsel at several points during the deliberations and sought the advice of Delta Mine's counsel, particularly regarding neutral arbitrator Wilson's unexpected proposed offset in the Williamson County award. It is apparent that neutral arbitrator Wilson was aware of and encouraged at least some of these communications. But in the district court's view, Stagg's disclosures "destroy[ed] the confidentiality of the panels' deliberations" and "manipulate[d] the process to Delta Mine's advantage."

undue emphasis on the Code of Ethics and in applying the statutory grounds for vacating arbitration awards found in § 10(a) of the Act.

## II. DISCUSSION

Though arbitration has been present in America as a form of dispute resolution since the eighteenth century, the Federal Arbitration Act of 1925 firmly established a "national policy favoring arbitration." Southland Corp. v. Keating, 465 U.S. 1, 10 (1984). Under that Act, "the grounds for challenging an arbitration award are narrowly limited, reflecting the voluntary contractual nature of commercial arbitration." IDS Life Ins. Co. v. Royal Alliance Assoc., Inc., 266 F.3d 645, 649 (7th Cir. 2001). As relevant to this case, § 10(a) of the Act authorizes a reviewing court to vacate an arbitration award:

> (1) Where the award was procured by corruption, fraud, or undue means.

> (2) Where there was evident partiality or corruption in the arbitrators, or either of them.

> (3) Where the arbitrators were guilty of . . . any other misbehavior by which the rights of any party have been prejudiced.

In this case, the lease agreements provided that arbitration proceedings shall "comply with the then applicable rules of the American Arbitration Association." However, the district court focused on whether party arbitrator Stagg violated the Code of Ethics, not the AAA's Commercial Arbitration Rules. The Code of Ethics provides that it "does not form a part of the arbitration rules of the American Arbitration Association," nor does it "establish new or additional grounds for judicial review of arbitration awards." It is well-settled that only the statutory grounds in § 10(a) of the Act justify vacating an award; arbitration rules and ethical codes "do

-7-

not have the force of law." Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 680 (7th Cir.), cert. denied, 464 U.S. 1009 (1983); see Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 149 (1968); Montez v. Prudential Sec., Inc., 260 F.3d 980, 984 (8th Cir. 2001). Thus, the district court erred in placing primary emphasis on whether party arbitrator Stagg violated various provisions of the Code of Ethics. "Unless there is a specific [statutory] ground for vacating an award, it must be confirmed." IDS Life Ins., 266 F.3d at 650; see ANR Coal Co., Inc. v. Cogentrix of N.C., 173 F.3d 493, 499 (4th Cir.), cert. denied, 528 U.S. 877 (1999). We therefore focus exclusively on those statutory grounds.

**1. Section 10(a)(2) -- "Evident Partiality."** The district court ruled that Stagg's on-going consulting relationship with Delta Mine and its attorneys, his participation in the pre-hearing preparation of Delta Mine's case, and his communications with Delta Mine and its attorneys during the panels' deliberations constituted "evident partiality" requiring that the awards be vacated under § 10(a)(2). In one sense, the district court's ruling was factually accurate -- Stagg was obviously partial, and his conduct during the course of the arbitrations was clearly inconsistent with the impartiality required of a neutral arbitrator in numerous cases such as the Supreme Court's Commonwealth Coatings decision. But whether we view the ruling as a finding of fact or a conclusion of law, it cannot be upheld because the court committed three errors of law in applying § 10(a)(2):

First, AFC waived this contention by failing to raise it to the arbitrators. AFC learned of Stagg's on-going participation in the preparation of Delta Mine's case well before the hearings. AFC expressed concern to the arbitrators, but only in the context of requesting a delay in the hearings (which was granted). AFC did not request Stagg's removal. Even when a neutral arbitrator is challenged for evident partiality, the issue is deemed waived unless the objecting party raised it to the arbitration panel. See Kiernan v. Piper Jaffray Cos., 137 F.3d 588, 593 (8th Cir. 1998). This rule furthers the policy of judicial deference to voluntary contractual arbitration:

It does not seem that general statutory language calling for the arbitrators to be impartial should be interpreted as refusing enforcement to the awards of arbitrations in which the parties contract for partisanship or waive objections to partiality. An interpretation under which a party could wait until it lost and then successfully raise the objection of partiality should be avoided.

Note, The Use of Tripartite Boards in Labor, Commercial, and International Arbitration, 68 HARV. L. REV. 293, 325 (1954).

Second, had AFC timely requested Stagg's removal on the ground of evident partiality, the request would have been denied as contrary to the parties' agreements to arbitrate. "Generally, partisan arbitrators are permissible." ATSA of Cal., Inc. v. Continental Ins. Co., 754 F.2d 1394, 1395 (9th Cir. 1985). Here, the lease agreements authorized the selection of a party arbitrator who is "an officer, employee or shareholder of, attorney or auditor to, or otherwise interested in, either of the Parties or the matter to be arbitrated." In other words, the arbitration agreements expressly contemplated the selection of partial arbitrators -- persons with substantial financial interests in and duties of loyalty to one party. "The parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." Merit Ins., 714 F.2d at 679.

AFC counters by arguing, without citation to pertinent authority, that party arbitrator Stagg's failure to fully disclose the extent of his relationship with Delta Mine and its attorneys constitutes evident partiality for purposes of § 10(a)(2). We disagree. At the organizational meeting, Stagg disclosed that "I've had a client consultant relationship with [Delta Mine's predecessor] since probably 1981, '82, somewhere in there." AFC should have assumed that Stagg had the same degree of "evident partiality" as an officer, employee, or attorney of Delta Mine, persons the lease agreements expressly authorized to be party arbitrators. Moreover, because the leases authorized the selection of partial party arbitrators, Stagg would have

perceived no apparent need to disclose more than his long-standing "client consultant relationship," absent a direction from the neutral arbitrators to do so.

Third, AFC failed to show that Stagg's "evident partiality" had a prejudicial impact on the arbitration awards. When a neutral arbitrator fails to disclose a relationship with one party that casts significant doubt on the arbitrator's impartiality, as in Commonwealth Coatings, it is appropriate to assume that the concealed partiality prejudicially tainted the award. But where the parties have expressly agreed to select partial party arbitrators, the award should be confirmed unless the objecting party proves that the party arbitrator's partiality prejudicially affected the award.

In this case, AFC failed to show that the neutral arbitrators were deceived or misled by party arbitrator Stagg's partiality. During the initial organizational meeting, neutral arbitrator Kitts referred to the party arbitrators as "partial."[4] The neutral arbitrators ruled that the party arbitrators, not the parties' attorneys, would question witnesses at the hearings. When AFC complained that party arbitrator Stagg was participating in the preparation of Delta Mine's case, the neutral arbitrators were not "taken back" because they wanted the party arbitrators fully prepared to question witnesses at the hearings. During deliberations, the neutral arbitrators dealt with the party arbitrators as advocates for their respective positions, precisely as one would expect from the terms of the agreements to arbitrate. So long as the neutral arbitrators were not deceived -- an issue AFC did not pursue in the district court[5] -- there was

---

[4]The Commercial Arbitration Rules provide that, absent an agreement to the contrary, party-appointed arbitrators are presumed to be non-neutral. See AMERICAN ARBITRATION ASSOCIATION, COMMERCIAL ARBITRATION RULES § 12 (1996).

[5]Though the district court's discovery order authorized inquiry into "the arbitration panels' understanding of arbitrator Stagg's role" and whether Stagg had influenced the proceedings in an improper manner, AFC did not depose the neutral arbitrators to explore these issues.

nothing insidious about this process. As Judge Posner observed in <u>IDS Life Ins.</u>, 266 F.3d at 651, "Arbitration is customized, not off-the-rack, dispute resolution."

Nor did AFC prove that its ability to prepare and present its case was prejudiced by Stagg's role as a partial party arbitrator. AFC knew from the agreements to arbitrate that the party arbitrators would be partial in the conflict-of-interest sense of that word. At the organizational meeting, AFC learned that the party arbitrators would question witnesses at the hearings. Weeks before the hearings, AFC learned that Stagg was helping Delta Mine prepare its case. Thus, AFC had ample time to prepare its party arbitrator to play a comparable role. As the Eleventh Circuit said in <u>Sunkist Soft Drinks v. Sunkist Growers</u>, 10 F.3d 753, 759 (11th Cir. 1993), <u>cert. denied</u>, 513 U.S. 869 (1994), a non-neutral party arbitrator's conduct in participating in meetings with witnesses, suggesting lines of testimony, helping select consultants, and advising an expert witness as to his testimony is "not only unobjectionable, but commonplace."

**2. Sections 10(a)(1) and (3) -- "undue means" and "misbehavior."** The district court also ruled that the awards must be vacated because Stagg's conduct before the hearings and during deliberations constituted "undue means" and "misbehavior by which [AFC's rights were] prejudiced" within the meaning of §§ 10(a)(1) and (3). A party seeking vacation of an award on either of these grounds must demonstrate that the conduct influenced the outcome of the arbitration. <u>See</u> <u>Painewebber Group v. Zinsmeyer Trust Partnership</u>, 187 F.3d 988, 994 (8th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1020 (2000) ("there must be some causal relation between the undue means and the arbitration award."); <u>M&A Elec. Power Coop. v. Local Union No. 702, IBEW</u>, 977 F.2d 1235, 1238 (8th Cir. 1992). Once again, AFC failed to sustain its burden on this issue.

AFC argues that Stagg disclosed to Delta Mine the substance of the panels' deliberations and the neutral arbitrators' draft decisions, and obtained input from

-11-

Delta Mine before responding to neutral arbitrator Wilson's proposed offset. But there is no evidence that this was contrary to what the neutral arbitrators expected and encouraged, and there is considerable evidence that party arbitrator Jones knew the role Stagg was playing and had equal access to his client and to the neutral arbitrators, for example, on the offset issue. We know that the neutral arbitrators' final awards were consistent with their draft decisions, so Stagg failed to dissuade arbitrator Wilson from awarding AFC an offset in the Williamson County award. AFC failed to satisfy its substantial burden to "demonstrate that the conduct influenced the outcome of the arbitration." M & A Electric, 977 F.2d at 1238; see Painewebber, 187 F.3d at 994-95.

**3. AFC's Alternative Grounds.** AFC argues that the awards should be vacated because the arbitrators improperly consolidated two separate arbitrations, disallowed cross-examination of witnesses, refused to hear new evidence, ignored key lease provisions, and issued awards that are irrational on their face. Having carefully reviewed the arbitration records, we conclude these contentions are without merit. Arbitration awards should be construed, whenever possible, so as to uphold their validity. "A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation." Burchell v. March, 58 U.S. (17 How.) 344, 349 (1854). The arbitrators' rulings were well within their procedural discretion,[6] their analysis drew its essence from the lease agreements, and we are satisfied that the awards were not "completely irrational" and did not "evidence[] a manifest disregard for the law." Kiernan, 137 F.3d at 594.

---

[6]"Arbitration may or may not be a desirable substitute for trials in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid." American Almond Prods. Co. v. Consolidated Pecan Sales Co., 144 F.2d 448, 451 (2d Cir. 1944).

**4. Delta Mine's Petition To Modify.** Delta Mine argues that the Williamson County award must be modified because neutral arbitrator Wilson exceeded his authority by including an offset in favor of AFC. Although an arbitration award may be modified to eliminate mistakes affecting the merits of the controversy "[w]here the arbitrators have awarded upon a matter not submitted to them," 9 U.S.C. § 11, we are satisfied the offset was fairly within the controversy submitted to the Williamson County panel. We decline Delta Mine's further invitation "to invade the province of the panel and re-adjudicate this [portion of the] dispute on its merits." UHC Mgmt. Co. v. Computer Sciences Corp., 148 F.3d 992, 998 (8th Cir. 1998).

## III. CONCLUSION

For the foregoing reasons, we conclude that neither party arbitrator Stagg's conduct nor the other grounds urged on appeal warrant either vacating or modifying the arbitration awards. The parties expressly agreed to the selection of partisan party arbitrators. Arbitrators Stagg and Jones were selected and performed accordingly, and courts have long upheld awards by tripartite arbitration panels consisting of two non-neutral party arbitrators and one neutral decision-maker. See generally Note, 68 HARV. L. REV. at 296-310.

It may be that many professional neutral arbitrators, if presented with this situation, would have required fuller initial disclosures by the party arbitrators and would have established clearer and better articulated procedural ground rules for the pre-hearing preparations and the post-hearing deliberations. But consistent with the agreements to arbitrate, the neutral arbitrators in this case were mining engineers, not professional arbitrators. Each announced at the organizational meeting that he had not previously served as a neutral arbitrator. Because arbitration is a matter of contract, we neither endorse nor condemn this mode of proceeding (though the litigation it has produced is certainly unfortunate). We merely hold that, because

-13-

AFC failed to demonstrate that arbitrator Stagg's conduct either misled the neutral arbitrators, prevented AFC from fairly presenting its case, or otherwise prejudiced the outcome of the arbitrations, the awards must be confirmed. The judgment of the district court is reversed and the case is remanded with instructions to confirm the Williamson County and Saline County awards in their entirety.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.