NATIONWIDE MUTUAL INSURANCE
COMPANY, Petitioner

v.

FIRST STATE INSURANCE COMPA-
NY, d/b/a First State Insurance
Group, Respondent/Cross–Petitioner

No. CIV.A. 00–10047–GAO.

United States District Court,
D. Massachusetts.

Aug. 2, 2002.

Michael H. Goldstein, Lawrence S. Greengrass, Mound, Cotton Wollan, New York City, David B. Chaffin, Hare & Chaffin, Boston, MA, for First State Insurance Company [DBA], First State Insurance Group, Respondents.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

Nationwide Mutual Insurance Company ("Nationwide") and First State Insurance Company ("First State") both complain about the award rendered by the three-member arbitral panel that presided over their contract dispute. Nationwide filed a petition to confirm the award in part and to modify the award in part, arguing that the panel accidentally wrote the wrong damage figure into the ultimate written award. First State responded to Nationwide's petition by filing a cross-petition to vacate the arbitration award because, it avers, one of the arbitrators was excessively biased toward Nationwide. This bias allegedly manifested itself in three ways: (1) the arbitrator too readily accepted Nationwide's legal arguments because she had reached a similar or identical conclusion in the past; (2) she had impermissible ex parte communications with Nationwide; and (3) her prejudice influenced the arbitration panel's decision not to allow First State to conduct certain discovery.

For the reasons discussed below, Nationwide's petition is GRANTED, and First State's petition is DENIED.

### A. Summary of Facts

Between 1969 and 1981, Nationwide and First State entered into a series of contracts in which Nationwide agreed to reinsure certain insurance policies issued by First State. In the mid–1970s a discussion began between the two parties regarding asbestos bodily injury claims that

Arnold Greenhut, Rosen, Greenhut, Catugno & Low, Springfield, MA, Michael L. Cohen, Cohen & Buckley, LLP, Baltimore, MD, for National Mutual Insurance Company, Petitioner.

First State had paid and sought to have reimbursed by Nationwide. In brief, the parties disagreed whether similar loss payments made on behalf of a particular insured could or should be aggregated and treated together as one "claim" or whether each individual loss payment should be treated as a separate claim. The distinction was significant because generally amounts paid out for bodily injury claims taken individually would not be large enough to trigger coverage under the applicable reinsurance contracts.

In January 1977, First State requested that Nationwide add an "aggregate extension clause" to the reinsurance contracts to expressly authorize the aggregation of claims. This new contract provision was referred to as "Addendum A." Nationwide would only agree to the prospective application of Addendum A.

In August 1993, First State demanded arbitration of certain asbestos liability claims which it had submitted to Nationwide and which Nationwide had rejected. The following is a representative arbitration clause from one of the reinsurance contracts:

> If any dispute shall arise between the Reinsured and the Reinsurer, either before or after the termination of this Contract, with reference to the interpretation of this Contract or the rights of either party with respect to any transaction under this Contract, the dispute shall be referred to three arbitrators, one to be chosen by each party and the third by the two so chosen. In the event the two arbitrators do not agree on the selection of the third arbitrator within thirty days after both arbitrators have been named, the Reinsured shall petition the American Arbitration Association to appoint an arbitrator.... The arbitrators shall consider this Contract an honorable engagement rather than merely a legal obligation; they are re-

lieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of the arbitrators shall be final and binding on both the Reinsured and the Reinsurer.

Petitioner's Mem. in Opp'n to Respondent's Mot. to Vacate, Ex. 3, Article XVI, Arbitration, at 6. First State appointed William J. Gilmartin to be its arbitrator, and Nationwide appointed Brunhilde Hufnagl–Hopkinson. Gilmartin and Hopkinson then appointed A. Edward Gschwind to be the Umpire.

In December 1994, First State sent a letter to Nationwide indicating that it objected to Hopkinson being Nationwide's party arbitrator. First State complained that Hopkinson had previously been an underwriter for First State's Casualty Excess Account with a reinsurance company called INA Re and had already taken a position on the issue to be arbitrated. It appears that while Hopkinson was an underwriter at INA Re, First State had had a dispute with INA Re about how to treat claims stemming from defective Riddell football helmets. As in the dispute between First State and Nationwide, INA Re had maintained that each personal injury constituted a separate claim, while First State had sought to characterize all of the individual injuries collectively as a single claim stemming from the manufacture and sale of the same defective product. At a meeting between First State and INA Re that occurred in 1978, Hopkinson expressed her opinion that each individual helmet injury represented a separate claim. Nationwide rejected First State's request to replace Hopkinson as its designated member of the arbitration panel.

On March 23, 1995, the panel of arbitrators held an organizational meeting, which the parties attended. First State rearticulated its opposition to Hopkinson, but stated that "subject to the positions that both

parties have taken [in their] correspondence, we are certainly prepared to proceed with this panel." *Id.* Ex. 2 at 8. The parties then agreed that each party would be permitted to have ex parte contacts with its party arbitrator until the first round of briefs were filed.[1] The Umpire also stated that Massachusetts law would apply to the arbitration and that the panel would "take cognizance of the American Arbitration Act, but, as in most arbitrations, the panel does not wish to be controlled strictly by rules of law." *Id.* Ex. 2 at 12.

After the organizational meeting, Hopkinson had some ex parte communications with Nationwide. The communications began around June 1995 when the parties had a disagreement regarding discovery matters. Nationwide wrote to the arbitration panel and asked for relief. First State responded and asked that the panel refrain from ruling on the matter so that the parties could work out their differences. Allegedly, Nationwide then contacted Hopkinson and learned from her that she and the Umpire were willing to rule in Nationwide's favor on the discovery dispute. The Umpire then sent a letter to Nationwide indicating that the panel had ruled in Nationwide's favor but apparently did not send a copy of the letter to First State. Nationwide faxed the information it had received from the Umpire to First State, and when First State's counsel spoke to Nationwide's counsel he learned that there had been a series of communications between Nationwide and Hopkinson. All of these ex parte communications took place before the parties filed their first round of briefs—i.e., they took place during the time period when the parties had

agreed that ex parte communications would be permitted.

The panel held its first hearing in June 1997. The purpose of the hearing was to resolve three legal questions, including the issue of which, if any, personal injury claims could be aggregated. This hearing ended what the parties now refer to as "Phase I" of the arbitration. During the three-day hearing, only First State presented documentary evidence and testimony on whether the asbestos injuries could be aggregated into a single claim. Nevertheless, the panel found in Nationwide's favor on the aggregation issue and held that Addendum A only applied after January 1, 1977. The panel also ruled that First State could not aggregate its other claims unless it could show "that a court has ruled otherwise in respect of their policy or the policy underlying; or, where First State can demonstrate that the underlying has settled on the basis of a single occurrence." *Id.* Ex. 7, ¶ 2. The parties and panel agreed that this decision would be called the "Interim Award." *Id.* at 16. Nationwide and First State then agreed to try to apply the Interim Award to the disputed claims and to sort out what was owed to First State without assistance from the panel. The panel retained jurisdiction over the dispute so that the parties could request another hearing if they could not agree on how much money Nationwide owed to First State.

After the panel issued the Interim Award, First State acquired new evidence that it believed showed that Nationwide had not been truthful about how it handled First State's asbestos claims. First State applied to the arbitration panel to reopen discovery to permit further investigation

1. The deadline for filing the first round of briefs was originally set at August 20, 1995. However, the discovery took much longer than anticipated and briefs were not filed until May 1997. First State concedes that ex parte communications between Nationwide and Hopkinson were permitted prior to May 6, 1997.

into the newly discovered evidence. Nationwide opposed First State's request, and the panel ruled that no additional discovery would be allowed.

The parties were not able to reach an agreement on how much First State should recover under the panel's interpretation of the reinsurance contracts. Consequently, they then submitted eight First State asbestos claims to the arbitrators to determine whether the claims satisfied the requirements for payment under the Interim Award. A hearing on these matters was held on October 26, 1999. This hearing concluded what the parties refer to as "Phase II" of the arbitration. At the hearing, First State withdrew two of the eight claims as premature. First State also made three requests: (1) it asked that the panel resign because of Hopkinson's bias, (2) it asked that the Interim Award be withdrawn for the same reason, and (3) it asked the panel to reconsider its decision regarding the reopening of discovery. All three requests were denied.

At the end of the Phase II hearing, the Umpire made the following oral ruling:

> To both parties, as respect to the instant cases, claims, we order Nationwide to pay U.S. Gypsum as presented and Owens–Illinois if not previously paid. All others are denied. The interest will be 6 percent compounded quarterly from 30 days after date billed on net balances. Reimbursement of attorneys' fees and costs is denied to both parties.

*Id.* Ex. 8 at 126. "US Gypsum" and "Owens–Illinois" refer to two of the six claims First State had given the panel to review. The panel thereafter memorialized this holding in a written order, which read, in part:

> Nationwide is ordered to pay First State Two-hundred Fifty-nine Thousand Eight-hundred Eighty-four Dollars ($259,884.00) as respects U.S. Gypsum asbestos losses and Eight-hundred Fifty-five Thousand Eight-hundred Ninety-eight Dollars ($855,898.00) as respects Owens–Illinois asbestos losses, plus interest to be calculated at a rate of six percent (6%) computed quarterly on net-balances from thirty (30) days after billing date. All other claims upon which presentation has been made in Phase II proceedings are denied.

*Id.* Ex. 9 at 2–3. When the arbitration panel rendered its decision, Nationwide had already paid First State $630,000 on the Owens–Illinois claim. Both First State and Nationwide agree that $630,000 was the principal amount owed, and that $855,898 was the amount of interest First State had claimed was owed on that principal amount, calculated at an annual rate of 12%. Nationwide believes that the arbitrators erred in their written order and had intended to award First State the principal amount of the Owens–Illinois claim ($630,000), not the interest amount calculated at a 12% rate ($855,898). Accordingly, Nationwide filed its Application for Confirmation in Part and Modification in Part of Arbitration Award under 9 U.S.C. § 9 and 9 U.S.C. § 11 to correct what it believes is an apparent error in the panel's written order. On January 24, 2000, First State made a Cross–Petition to Vacate Arbitration Award under 9 U.S.C. § 10(a)(2) and (3).

**B.** *Nationwide's Petition to Modify the Phase II Award*

■ This Court agrees with Nationwide that the amount of the award as respects Owens–Illinois written in the panel's final award is an error. There is an inconsistency between the amount in the written award and what the panel said (through the Umpire) at the conclusion of the Phase II hearing. In announcing their decision orally at the hearing, the arbitrators said that Nationwide was to pay the principal amount of the Owen–Illinois claim, if not

already paid, and further to pay interest calculated at the rate of 6%. The $855,898 figure included in the final award is neither; it is not the principal amount of the Owens–Illinois claim and it is not interest on that amount figured at a rate of 6%. Rather, the $855,898 figure represents the amount of interest First State had requested be awarded. As a practical matter, it is easy to see how the error occurred. The proposed "Final Award" that First State submitted to the arbitration panel included a chart with the headings: "Claim," "Award," and "Interest." Under the heading "Claim," First State listed the principal amount owed for six of the claims at issue and left the "Interest" column blank. For the Owens–Illinois claim, however, First State included the $855,898 interest amount in the "Claim" column rather than in the "Interest" column. While First State did note in the chart that the $855,898 was "interest," the note was easily overlooked because this manner of presentation differed from the format used in the table for all the other claims, and especially because there was a separate column for interest amounts. In sum, Nationwide has convincingly argued that the inclusion of the $855,898 figure in the final award as the recognized principal amount of the Owens–Illinois claim was a simple mistake. The award should be corrected to substitute the agreed principal amount of the Owens–Illinois award, $630,000. (The parties also agree that the amount has been paid.) Consistent with the arbitrators' award, interest at the rate of 6% is to be computed on that amount for the time it remained unpaid.

## C. First State's Cross–Petition to Vacate

### 1. Timeliness

■ A party to an arbitration may appeal an award by an arbitral panel to the federal district courts within one year of the date on which the award is made.

See 9 U.S.C. § 9. See also Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231, 233 (1st Cir.2001). Only a final decision—not an interlocutory one—is appealable and triggers the statute of limitations period. See Hart Surgical, 244 F.3d at 233. Nationwide argues that First State's petition to vacate the decision embodied in the Interim Award is barred because it was filed more than a year after the Interim Award was issued.

■ A series of recent First Circuit decisions have addressed what may qualify as a "final" decision by an arbitral panel. In Fradella v. Petricca, 183 F.3d 17, 19 (1st Cir.1999), the court held that "[n]ormally, an arbitral award is deemed 'final' provided it evidences the arbitrator's intention to resolve all claims submitted in the demand for arbitration, even though the arbitrators purport to retain jurisdiction in the event the need arises to resolve some subsidiary matter, such as damages or backpay calculations." Applying this standard, the court found that an arbitration panel's award was final even though the award contained an error which the panel later corrected. Id. at 20.

Two years later in Hart Surgical, the court ruled that when an arbitration is formally bifurcated into liability and damages phases, the arbitration panel's award with respect to liability is a final award. 244 F.3d at 235–36. The court stated that "the definiteness with which the parties have expressed an intent to bifurcate is an important consideration." Id. at 235. In a case where the parties submitted "in a discrete proceeding, all of the evidence pertaining to the issue of liability" and the arbitrators "conclusively decided every point required by and included in this submission," the arbitrator's liability decision was final. Id. (citations and internal quotations omitted).

Most recently, in *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16 (1st Cir.2001), the First Circuit held that even when an arbitration is informally bifurcated, the panel's award at the end of the first phase is a final award. In reaching this decision, the court focused chiefly on two factors: "(1) whether, and to what extent, both parties had expressed an intent to bifurcate, and (2) whether the arbitrator and the parties understood the determination of liability to be a final award." *Id.* at 19. The court added that the parties' intent to bifurcate could be implied from the parties' actions, even though the parties never formally bifurcated the arbitration. *Id.* at 20.

The Interim Award issued in this case would be final under the *Providence Journal* standard. At the end of Phase I, the panel completely resolved the three legal issues that the parties had presented to them. The only thing that remained to be done was to apply the panel's interpretation of the reinsurance contracts to the actual claims. There are several indications that the parties and the arbitrators intended the Interim Award to be final. First, both parties agreed that the decision at the end of Phase I should be called an "award," even though it was an "interim" one. One of the arbitrators, Gilmartin, suggested that the decision be called a "guidance memo," but the attorney for First State proposed that it be called "Interim Award" and the others agreed. More importantly, after the Interim Award was issued, the arbitrators refused to reopen discovery into matters that had been addressed in Phase I, an indication that the panel viewed those matters as having been finally resolved and not subject to being revisited. *See also Trade & Transp., Inc. v. Natural Petroleum Charterers, Inc.*, 931 F.2d 191, 195 (2d Cir.1991) (after a panel renders a decision, it does not have authority to revisit issues finally decided). Finally, in the "Final Award,"

the panel did not restate the findings and conclusions of the Interim Award, but merely cited that portion of the Interim Award which the panel used to evaluate the six claims which the parties had not been able to resolve in light of the prior ruling and which therefore had been submitted to the panel for resolution. It thus appears that the panel—and the parties— regarded the Interim Award as having finally settled the issues it addressed. Under the *Providence Journal* analysis, the Interim Award was final enough to be reviewable, and First State's motion to vacate, made more than a year after the Interim Award, was untimely.

However, *Providence Journal* had not been decided when the Interim Award was made. While "the practice of making judicial decisions fully retroactive . . . is overwhelmingly the norm," the First Circuit has also noted that, on occasion, it is better not to apply a decision retroactively "where a decision displaces a principle of law on which reliance may reasonably have been placed, and where prospectivity is on balance warranted by its effect on the operation of the new rule and by the inequities that might otherwise result from retroactive application." *Amann v. Town of Stow*, 991 F.2d 929, 934 (1st Cir.1993) (citations and internal quotations omitted). Moreover, the finding of finality in *Providence Journal*, 271 F.3d at 20, led to the court's decision to reach the merits of the case. There might be more reluctance to employ the rule to foreclose review. *See Hart Surgical*, 244 F.3d at 235 (acknowledging that there is "a tension between the desire to effectuate the parties' intent to divide an arbitration into distinct phases, and making sure that a losing party does not thereby forfeit an appeal by failing to object after the completion of a phase"). In light of these uncertainties about the scope and retroactivity of *Providence*

*Journal,* this Court will address the merits of First State's assertions.

## 2. First State's Allegations of Bias

■ The Federal Arbitration Act allows a district court to vacate an arbitration award where "there was evident partiality or corruption in the arbitrators." 9 U.S.C. § 10(a)(2). Evident partiality requires more than just an appearance of bias; there must be some actual evidence of bias. *See Nationwide Mut. Ins. Co. v. Home Ins. Co.,* 278 F.3d 621, 626 (6th Cir.2002) ("The alleged partiality must be direct, definite, and capable of demonstration, and the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator."); *Gianelli Money Purchase Plan and Trust v. ADM Investor Servs., Inc.,* 146 F.3d 1309, 1312 (11th Cir. 1998) ("The alleged partiality must be direct, definite and capable of demonstration rather than remote, uncertain and speculative."); *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,* 991 F.2d 141, 146 (4th Cir.1993) (same); *Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 933 F.2d 1481, 1489 (9th Cir. 1991) (a party "must demonstrate more than a mere appearance of bias to disqualify an arbitrator"). At several points in its memoranda, First State cites state law and other sources for guidance on what is improper behavior by an arbitrator. However, "[i]t is well-settled that only the statutory grounds in § 10(a) of the Act justify vacating an award; arbitration rules and ethical codes do not have the force of law." *Delta Mine Holding Co. v. AFC Coal Props., Inc.,* 280 F.3d 815, 820 (8th Cir. 2001) (citations and internal quotations omitted).

■ The burden on First State to show that Hopkinson was "evidently partial" to Nationwide is even greater because Hopkinson was Nationwide's party arbitrator on a three-person panel. Under the parties' contracts, she was not required to be neutral like the Umpire. "Generally, partisan arbitrators are permissible," if that is what the parties' arbitration clause contemplated. *ATSA of Cal., Inc. v. Continental Ins. Co.,* 754 F.2d 1394, 1395 (9th Cir.1985). When parties choose to use two party arbitrators and one neutral arbitrator, they "can ask no more impartiality than inheres in the method they have chosen." *Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 679 (7th Cir.1983). For example, the Eighth Circuit found that a party arbitrator had not acted improperly when he assisted in preparing his party's witnesses because the arbitration agreement had expressly permitted the selection of an interested person as an arbitrator. *See Delta,* 280 F.3d at 821. These cases demonstrate that what constitutes improper partiality under 9 U.S.C. § 10(a)(2) will vary depending on the precise terms and procedures parties establish for their particular arbitration.

Courts also have recognized that arbitrators frequently are experienced and familiar with the matters they are asked to decide. The Seventh Circuit has commented that, "people who arbitrate do so because they prefer a tribunal knowledgeable about the subject matter of their dispute to a generalist court with its austere impartiality but limited knowledge of subject matter." *Merit,* 714 F.2d at 679. As a result, an arbitration often represents a "tradeoff between impartiality and expertise." *Id.* The Second Circuit similarly has stated that "a principal attraction of arbitration is the expertise of those who decide the controversy. Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw." *In re Andros Compania Maritima, S.A.,* 579 F.2d 691, 701 (2d Cir.1978).

First State argues that there are three ways in which Hopkinson's behavior demonstrated that she was improperly partial toward Nationwide. First, it argues that the views Hopkinson adopted during First State's dispute with INA Re almost twenty years prior to this arbitration irreversibly biased her against their position. To begin with, First State does not show that the controversies were similar enough to make comparison meaningful. Contract interpretation depends greatly on the precise wording at issue, and First State has not shown that the clauses in dispute in the arbitration were identical to the ones in its prior dispute with INA Re. More importantly, First State has not demonstrated that the position Hopkinson took in the late 1970s when she was acting as an advocate for one party's point of view was so enduring that she was unable or unwilling to reexamine the position when acting as an arbitrator. Any person of substantial experience would over the course of her career have developed some opinions about issues arising in the field of experience, but that general circumstance would not automatically disable such a person from fairly evaluating the merits of a particular controversy. Besides, the arbitration structure the parties chose expressly permitted them to nominate one arbitrator each whose general views would, at the very least, not be inimical to the nominator's interest in the case. First State's own designated member of the panel explained:

> The way I approach an arbitration is the party tells me what the case is and what their side of it is. If I disagree with them I tell them you better not appoint me. If their case seems right, I tell them I think they're right but I haven't heard the other side so I cannot guarantee that I will vote your way. I have to hear all the evidence before I make up my mind.

Reply Mem in Further Supp. of First State's Cross–Pet. to Vacate Arbitration Award Ex. B at 15. Hopkinson's prior expression of an opinion 18 years earlier certainly is no more disqualifying than the kind of preview screening of the very claims to be submitted that First State's designated arbitrator described (and presumably conducted).

### 3. Ex Parte Communication

■ First State's argument that Hopkinson's ex parte communications with Nationwide are evidence of improper bias is also unconvincing. Virtually all the ex parte communications that can be identified occurred within the period during which the parties had expressly agreed to countenance ex parte communications. The only incident cited by First State that occurred after that period had closed was an instance in which Nationwide sent a letter to the arbitration panel but failed immediately to serve First State. The omission was corrected within a matter of days. Even if this incident could be characterized as an ex parte communication, it was not one sent only to Hopkinson, but to the whole panel. It is not a basis for finding partiality on Hopkinson's part.

The rules the parties established at the organizational meeting further demonstrate that the arbitrators were never intended to be entirely neutral. It was agreed that each party would pay the cost of its own arbitrator and that the party arbitrators' billings would remain confidential. As noted, the parties also agreed that each party would be allowed to engage in ex parte contacts with its designated arbitrator until the substantive briefs were filed. Taking all of these circumstances together, it is evident that the parties never intended Hopkinson to be neutral to the same extent as the Umpire. Nationwide had the right to choose some one who was an expert in reinsurance contracts and

who had encountered and resolved similar disputes in the past, and it had a right to speak confidentially with its arbitrator in the early stages of the proceedings.

 Finally, First State's claim that the panel's decision to deny its motion for more discovery after the Interim Award was announced is evidence of bias is insufficient. A panel's decision to rule against a party, by itself, cannot be evidence of bias. Nor is there any evidence that Hopkinson, whose bias is alleged, procured the adverse ruling.

None of First State's claims of "evident partiality" on the part of Hopkinson is persuasive, and none supplies a reason to vacate the award.

4. The Panel's Refusal to Reopen Discovery

 First State's final attack on the arbitration award is that the panel wrongly denied First State's request to reopen discovery. Under the Federal Arbitration Act, a district court may vacate an award if the arbitrators were "guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). However, "an arbitrator is not required to hear newly discovered evidence, and such evidence is not a basis for vacating an arbitration award . . . ." *Conlux USA Corp. v. Dixie–Narco Inc.*, 929 F.Supp. 269, 274 (N.D.Ohio 1996) (citing *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 313 (7th Cir.1981)). Arbitrators are "not bound to hear all of the evidence tendered by the parties," though they "must give each of the parties to the dispute an adequate opportunity to present its evidence and arguments." *Hoteles Condado Beach, La Concha and Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir.1985).

 First State certainly had such an opportunity. It received a full and adequate hearing on the aggregation issue.

The record reflects that the parties had over two years to conduct discovery and prepare for the Phase I hearing. The arbitrators accepted briefs and heard three days of evidence before rendering their decision. When First State asked to reopen discovery after the Interim Award was announced, the arbitrators considered the request and denied it. The arbitrators gave First State another opportunity to raise its objections at the Phase II hearing. On this record, their decision not to reopen discovery into an already decided issue was eminently reasonable, and the arbitrators were not guilty of "misconduct" by refusing to allow further discovery.

*Conclusion*

Nationwide's petition to modify in part and vacate in part is GRANTED. The final award is hereby modified to state that Nationwide must pay, "Six hundred thirty thousand and no/100 dollars ($630,000.00) as respects Owen–Illinois asbestos losses, plus interest to be calculated at a rate of six percent (6%) computed quarterly on net-balances from thirty (30) days after billing date." The rest of the award shall is confirmed as issued.

First State's cross-petition to vacate is DENIED as untimely and on the merits.

It is SO ORDERED.