*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 20-CV-15, 20-CV-229, 20-CV-243 & 20-CV-244

C.R. CALDERON CONSTRUCTION, INC., APPELLANT/CROSS-APPELLEE,

V.

GRUNLEY CONSTRUCTION COMPANY, INC., APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(CAB-747-16)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued May 20, 2021     Decided August 26, 2021)

*James J. Faughnan* for appellant/Cross-Appellee Allegheny Casualty Company, with whom *Leonard A. Sacks*, Appellant-Cross-Appellee C.R. Calderon Construction, Inc.

*Robert J. Symon*, with whom *Eric A. Frechtel*, Attorneys for Appellee-Cross-Appellant Euro Capital Properties, LLC, Appellee-Cross-Appellant Grunley Construction Company, Inc.

Before GLICKMAN and MCLEESE, *Associate Judges*, and FISHER, *Senior Judge*.

FISHER, *Senior Judge*: These appeals come to us from orders of the Superior Court related to an arbitration award. The underlying dispute arose between the general contractor renovating the Watergate Hotel and a subcontractor. Appellant

C.R. Calderon Construction, Inc. ("Calderon"), the subcontractor, asks us to reverse the trial court's decision confirming the award in favor of Grunley Construction Company, Inc. ("Grunley"), the general contractor. Grunley cross-appealed, asking us to reverse the trial court's decision denying its motion for attorney's fees expended in the post-arbitration litigation in Superior Court. For the following reasons, we affirm the court's decision confirming, and entering judgment upon, the arbitration award. We reverse the court's decision denying Grunley's request for attorney's fees and remand that motion for further consideration.

## I. The Factual and Procedural Background

In 2014, Euro Capital Properties, LLC ("Euro"), the owner of the property, retained Grunley to serve as general contractor on the renovation of the Watergate Hotel; Grunley engaged Calderon as a subcontractor. According to Grunley, Calderon defaulted and left the project before it was completed, requiring Grunley and Euro to strike a new agreement to retain and pay for additional subcontractors to finish the renovation. In 2016, Calderon sued Grunley and Euro seeking payment for work it had performed before leaving the project. Grunley responded with a counterclaim for additional costs incurred because of Calderon's default,

and filed a third-party complaint against Allegheny Casualty Company ("Allegheny"), which had issued a performance bond on behalf of Calderon. In 2018, the parties agreed to resolve the dispute through arbitration.

The arbitration agreement provided that the two sides of the dispute would each select a neutral arbitrator, and that these two arbitrators would select a third neutral arbitrator. After learning that its initial selection could not serve, Grunley instead chose Stephen Shapiro, an attorney. Mr. Shapiro did not disclose any potential conflicts.

Following hearings in May 2019, the arbitration panel – including Mr. Shapiro – unanimously awarded Grunley $1,527,122.00 (plus interest), as well as attorney's fees and expenses totaling $700,000.00. Grunley and Euro filed a motion to confirm the arbitration award, while Calderon and Allegheny filed motions to vacate it. Based on research conducted after the award was issued, Calderon and Allegheny argued that Mr. Shapiro had violated D.C. Code § 16-4412(a) (2012 Repl.) by failing to disclose that, before and during the pendency of the arbitration, he served on the board of Associated General Contractors of the District of Columbia ("AGC") – an industry association – along with various employees of Grunley. They also contended that Mr. Shapiro violated the statute

by failing to disclose that some attorneys who work at the same law firm as Mr. Shapiro had represented Euro or a Euro affiliate. Calderon separately argued that the arbitrators exceeded the scope of their authority and manifestly disregarded the law by awarding such a large amount in damages, attorney's fees, and expenses.

The Superior Court, the Honorable Anthony C. Epstein, confirmed the award and issued a corresponding judgment. Grunley then moved for attorney's fees as authorized by D.C. Code § 16-4425(c) (2012 Repl.). The court denied Grunley's motion. Calderon and Allegheny appealed the judgment, while Grunley cross-appealed the denial of its motion for attorney's fees. Having reached a settlement with Grunley, Allegheny has since dismissed its appeal.

Calderon asserts on appeal that the arbitration award must be set aside for two independent reasons: (1) because one of the arbitrators (Stephen Shapiro) failed to disclose information that called his impartiality into question and (2) because the arbitrators manifestly disregarded the law in making the award. Grunley claims that the court erred in denying its motion for attorney fees in connection with the post-award litigation in Superior Court. We address these issues in that order.

## II.  The Failures to Disclose

Calderon argues that the trial court erred in interpreting and applying the Revised Uniform Arbitration Act (RUAA) – the District's body of statutes governing arbitration.  It contends that Mr. Shapiro's failure to disclose (1) that he sat on the board of an industry association at the same time as certain Grunley employees and (2) that some attorneys at his law firm represented an affiliate of Euro violated D.C. Code § 16-4412 and required the court to vacate the award.

"We review mixed questions of law and fact under our usual deferential standard of review for factual findings and apply de novo review to the ultimate legal conclusions based on those facts."  *Hilton v. United States*, 250 A.3d 1061, 1068 (D.C. 2021) (cleaned up) (citing *Caison v. Project Support Servs., Inc.*, 99 A.3d 243, 248 (D.C. 2014)).  "We review questions of statutory interpretation de novo."  *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1233 (D.C. 2016).

### A.  The Statutory Obligation to Disclose

Under the District's RUAA, D.C. Code §§ 16-4401 to -4432 (2012 Repl.), a person who has been requested to serve as an arbitrator has the duty to conduct "a

reasonable inquiry" and then to disclose "any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding." D.C. Code § 16-4412(a). The scope of the general obligation to disclose thus is expressly limited by the "reasonable person" and "likely to affect the impartiality" standards incorporated into the statute. These standards also apply to, and assist in defining, the two types of disclosures required by the statute: "(1) A financial or personal interest in the outcome of the arbitration proceeding; and (2) An existing or past relationship with any of the parties to the agreement to arbitrate or the arbitration proceeding, their counsel or representatives, a witness, or other arbitrators." D.C. Code § 16-4412(a)(1)-(2).[1]

---

[1] Subsection 4412(a) reads in full:

> (a) Before accepting appointment, an individual who is requested to serve as an arbitrator, after making a reasonable inquiry, shall disclose to all parties to the agreement to arbitrate and arbitration proceeding, and to any other arbitrators, any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding, including: (1) A financial or personal interest in the outcome of the arbitration proceeding; and (2) An existing or past relationship with any of the parties to the agreement to arbitrate or the arbitration proceeding, their counsel or representatives, a witness, or other arbitrators.

Failure to make disclosures required by subsection (a) of § 4412 permits the court, in its discretion, to set aside the arbitration award.[2] A later portion of the statute provides that failure to disclose specified information triggers a presumption that the arbitrator acted with "evident partiality."[3] If that presumption remains unrebutted, or if the evidence establishes evident partiality, D.C. Code § 16-4423(a)(2)(A) requires the court to vacate the arbitration award.

## B. The Trial Court's Order

The trial court's analysis followed the structure of the statute as outlined above. First, Judge Epstein determined that the "reasonable person" and "likely to affect the impartiality" standards applied to subsections (a)(1) and (a)(2). In other words, "[t]he limiting principle that applies to the disclosure obligation is the principle articulated in § 16-4412(a) itself: whether a reasonable person would consider a relationship likely to affect the arbitrator's impartiality." He concluded

---

[2] "If the arbitrator did not disclose a fact as required by subsection (a) or (b) of this section, upon timely objection by a party, the court, under § 16-4423(a)(2), may vacate an award." D.C. Code § 16-4412(d).

[3] "An arbitrator appointed as a neutral arbitrator who does not disclose a known, direct, and material interest in the outcome of the arbitration proceeding or a known, existing, and substantial relationship with a party is presumed to act with evident partiality under § 16-4423(a)(2)." D.C. Code § 16-4412(e).

that "a reasonable person would not consider [Mr. Shapiro's] relationships, individually or collectively, likely to affect Mr. Shapiro's impartiality, so Mr. Shapiro was not required to disclose them under D.C. Code § 16-4412(a)."

Alternatively, Judge Epstein held that even if Mr. Shapiro's failures to disclose violated subsection (a), "the Court would exercise its discretion under § 4412(d) not to vacate the award because the relationships that Mr. Shapiro did not disclose do not create" a reasonable likelihood of bias. The court also concluded, again assuming for the sake of argument that there had been a violation of subsection (a), that "the presumption of evident partiality does not arise in this case" because Mr. Shapiro did not have "a substantial relationship with Grunley" and he did not have a "known, direct, and material interest in the outcome of the arbitration proceeding." "For the same reasons," the court stated, "the relationships do not cast serious doubt on Mr. Shapiro's ability to be impartial, so the Court is not required to vacate the award under § 16-4423(a)(2)."

## C. Analysis

Calderon's lead argument is that the trial court erred in failing to apply the presumption of evident partiality found in D.C. Code § 16-4412(e).[4] It emphasizes that Mr. Shapiro failed to disclose his relationship with Adam Grunley – a vice president at Grunley Construction – and other Grunley employees who served on the AGC board; he also did not disclose that other attorneys at his law firm represented Euro (or a Euro affiliate) on matters predating the arbitration. Calderon contends, contrary to the trial court's determination, that these relationships were substantial because Mr. Shapiro served on the AGC board for seventeen years, the board was small (only thirteen to fifteen members), and it met monthly before, during, and after the arbitration. Calderon also asserts that Mr. Shapiro's service on the AGC board of directors presented a "known, direct, and material interest" in the outcome of the arbitration because an attorney's purpose for participating in trade industry groups is to meet and curry favor with potential clients.

Calderon also urges us to incorporate several principles into our review of questions like this one and ultimately seems to contend that *any* non-disclosure should trigger a rebuttable presumption of evident partiality. First, it posits that a

---

[4] Calderon incorporates by reference the brief on this issue filed by Allegheny.

party to arbitration has a "fundamental right to judge the neutrality of an arbitrator before the hearing," and the arbitrator's failure to disclose prevents the party from exercising that right. Second, it asserts that a party to arbitration "is entitled to expect full disclosure by the arbitrator prior to the hearing regardless of what he or she deems as trivial." Third, "[w]ithout any disclosure and without a hearing, there is no factual record to support . . . an after-the-fact determination of whether the nature and extent of the relationship required disclosure by the arbitrator." Therefore, according to Calderon, the party moving to vacate an award due to a non-disclosure should not bear the burden to prove arbitrator partiality; instead, the arbitrator and any party with whom he or she has a relationship should bear the burden to prove that an undisclosed relationship was trivial. Finally, Calderon asserts that the court's analysis "should be limited to the fact that the disclosure was not made by the arbitrator or the party that selected the arbitrator," and a failure to disclose should trigger a presumption of evident partiality that the arbitrator (and any party with whom he or she has a relationship) must rebut.

Before turning to the failures to disclose at issue here, we highlight two important considerations. First, there is no doubt that the RUAA places affirmative obligations on the nominated arbitrator to make "a reasonable inquiry" and thereafter to make certain disclosures. D.C. Code § 16-4412(a). But the

problem with Calderon's argument is that the Council of the District of Columbia enacted a different statute than Calderon envisions, and understandably so. A disappointed party to arbitration could always find some fact about an arbitrator that was not disclosed. The statute describes in general terms disclosures that *should* be made, but it also makes clear that some failures to disclose will not *require* the court to vacate the award. The statute also reserves the presumption of evident partiality for non-disclosures of a particular nature.

Second, it is generally thought to be important that arbitrators be familiar with the industry in which the dispute arises. *See, e.g.*, *Celtech, Inc. v. Broumand*, 584 A.2d 1257, 1259 (D.C. 1991) (noting that "arbitrators are usually knowledgeable individuals in a given field and have interests which overlap with the issues which they are considering as arbitrators"); *Int'l Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548, 552 (2d Cir. 1981) ("The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose."). As the commentary to the uniform act explains, the various provisions found in § 4412(c), (d), and (e) "seek to accommodate the tensions between concepts of partiality and the need for experienced decision makers, as well as the policy of relative finality in arbitral awards." Uniform Arbitration Act (2000) § 12, cmt. 4. Thus, an appearance of

bias that might disqualify a judge will not necessarily disqualify an arbitrator. *Celtech*, 584 A.2d at 1259; *see also Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir. 1983) ("The ethical obligations of arbitrators can be understood only by reference to the fundamental differences between adjudication by arbitrators and adjudication by judges and jurors.").

More specifically, in this case the parties agreed that the arbitrators should meet the following qualifications: "The arbitrators selected by each side, and as the third arbitrator, shall have at least 15 years of experience in construction matters and shall, at a minimum, have represented both contractors and subcontractors during the course of their career." In this context, a reasonable person would not think that merely being acquainted with the parties or their representatives would be disqualifying.

**1. The Presumption of Evident Partiality Did Not Apply.**

With these observations in mind, we decide a mixed question of law and fact: whether the trial court clearly erred in determining the facts or erred in applying the law when considering the presumption of evident partiality. That presumption applies when the challenging party demonstrates that a neutral

arbitrator did "not disclose a known, direct, and material interest in the outcome of the arbitration proceeding or a known, existing, and substantial relationship with a party." D.C. Code § 16-4412(e). As Judge Epstein concluded, the first prong of § 4412(e) has not been satisfied because Calderon has offered no evidence that Mr. Shapiro would have benefited directly and materially from ruling in Grunley's favor. Despite Calderon's emphasis on the importance of networking in attracting clients, attorney Shapiro's supposed interest in currying favor with AGC members over time with the hope that they might retain him for future matters is not a "direct . . . interest in the outcome of the arbitration proceeding." The trial court did not clearly err in determining that appellant had not presented facts that would move this assertion "out of the realm of speculation." Because a speculative interest is not a "known, direct, and material interest," we cannot say that the trial court incorrectly applied the law.

Mr. Shapiro's failures to disclose that he served on the AGC board with Mr. Grunley and that his law firm colleagues worked with Euro or a Euro affiliate on zoning and land use matters related to the Watergate project do not satisfy the second prong of § 4412(e) – that there be "a known, existing, and substantial relationship with a party." Though they share a name – and presumably some family history in the organization – Mr. Grunley is not Grunley Construction; he

was not a party to the arbitration.[5]  We recognize that a corporation must act through agents, but Calderon has not asserted, much less established, that Mr. Grunley participated in the arbitration as a representative of Grunley Construction, as a witness, or even as an observer.  Moreover, as the trial court concluded, Mr. Shapiro's "relationship with AGC [itself] is not a substantial relationship with Grunley."[6]

As for the prior representation by the law firm, there was no evidence that Mr. Shapiro was personally involved or that the issues to be resolved in the arbitration turned in any way on the legal services previously rendered.  And, as Judge Epstein observed, "the fact that the representation ended two years before

[5]  Appellant names two other Grunley employees who also happened to serve on the AGC board (at different times) with Mr. Shapiro, but there is no difference between them and Mr. Grunley for purposes of analyzing Mr. Shapiro's non-disclosures.  The same rationale would apply to other Grunley employees because the company – not any individual employee – was the party to the arbitration.

[6]  Calderon also asserts that, as a member of the board, Mr. Shapiro had a fiduciary duty to AGC which extended to Mr. Grunley, his fellow board member, and from him to Grunley Construction.  We disagree.  First, AGC was not a party to the arbitration; therefore, Mr. Shapiro's fiduciary duty to the organization would not demonstrate a "known, existing, and substantial relationship with a party." D.C. Code § 16-4412(e).  In addition, the trial court explained that, "[t]o the extent that a board member has a fiduciary duty to association members as well as the association, any such duty would apply only to actions the board member takes in his capacity as a board member to manage the association's affairs."

the arbitration proceeding began is relevant to whether the firm's relationship was likely to affect Mr. Shapiro's impartiality as an arbitrator."  Even assuming the accuracy of Calderon's argument that Mr. Shapiro's colleagues had actually represented Euro and not its affiliate, this relationship pre-dated the arbitration and cannot be called "existing," as required by § 4412(e).  For these reasons, the trial court properly concluded that the presumption of evident partiality did not arise in this case.

## 2.  Calderon Did Not Prove Evident Partiality.

Calderon protests that the trial court's ruling was tantamount to requiring a party to *prove* evident partiality in order to benefit from the presumption.  It further argues that the Council's adoption of the RUAA altered the legal framework and that our pre-existing precedent on evident partiality is no longer relevant.  We disagree.  By creating a presumption, the RUAA may have made it easier to prove evident partiality, but it did not enact a superseding definition of that concept or purport to nullify our existing precedent.[7]

---

[7]  Before the RUAA was enacted, we gave non-exhaustive examples of "evident partiality": "Evident partiality exists where an arbitrator has had close financial relations for many years with a party to the arbitration."  *Celtech*, 584 A.2d at 1259 (citing the plurality opinion in *Commonwealth Coatings Corp. v.*

(continued…)

Calderon does not pay sufficient attention to the wording of § 4412(e), which opens a new path to proving evident partiality in narrowly prescribed circumstances. If a party challenging an arbitration award meets the criteria of subsection (e), then it benefits from the presumption. If not, it may still prevail by demonstrating evident partiality under our existing and developing precedent. We now consider whether the evidence – insufficient to trigger the presumption – nonetheless proves evident partiality.

When considering an arbitrator's failure to disclose a relationship, "[t]he relevant inquiry concerns not only the fact of the nondisclosure, but the nature of the relationship between [the arbitrator] and [the parties]." *Umana v. Swidler & Berlin, Chartered*, 745 A.2d 334, 340 (D.C. 2000). In *Umana*, an arbitrator had failed to disclose a prior professional relationship with an individual "who acted as Swidler & Berlin's representative and testified in the arbitration proceedings." *Id*. at 336. We nevertheless concluded that the relationship, which began "some twenty years before the arbitration in question" and only "continued on a sporadic basis thereafter," was "not the kind that threatens bias justifying vacation of the

_____

(…continued)
*Continental Cas. Co.*, 393 U.S. 145, 146 (1968)). "The same has been found to be true where the arbitrator was the son of an officer of one of the parties." *Id*.

arbitral award." *Id*. at 340. A reviewing court should be concerned, rather, with relationships that give rise to a sense of "loyalty owed to one side of the dispute," *id*. at 340-41 (quoting *Cellular Radio Corp. v. OKI America, Inc.*, 664 A.2d 357, 360-61 (D.C. 1995)), or that are "so intimate – personally, socially, professionally, or financially – as to cast serious doubt on [an arbitrator's] impartiality." *Id*. at 341 (quoting *Merit Ins. Co.*, 714 F.2d at 680). While *Umana* does not foreclose the possibility that a professional relationship could be so close as to cast doubt on an arbitrator's impartiality, it also makes clear that close personal relationships are much more problematic than professional interconnections, which are "a common occurrence in the legal circles in the District of Columbia where the parties, their counsel and the arbitrators practice." *Id*. at 342 (footnote omitted).

According to Adam Grunley's declaration, which Calderon has not attempted to refute, Mr. Grunley joined the AGC as a regular member in 2004, became a board member in 2015, and served as president of the board for one year, from 2017 to 2018. Most board members participated in their monthly meetings by telephone. As Mr. Grunley recalled, he had "only met Mr. Shapiro once or twice in person." They never discussed the arbitration. Finally, Mr. Grunley disclaimed having ever had any conversation with Mr. Shapiro during the period when the arbitration took place, at an AGC social function that Calderon mentions

in its brief, or in relation to two amicus curiae briefs that Mr. Shapiro prepared on AGC's behalf in unrelated legal matters.

So far as Calderon has demonstrated, Mr. Grunley's relationship with Mr. Shapiro was not the type that would instill "loyalty owed to one side of the dispute." Unlike in *Commonwealth Coatings*, see note 7, *supra*, there is no evidence that Mr. Shapiro had past financial dealings with Grunley. And in comparison to *Umana*, where the undisclosed relationship involved a representative and witness who actually participated in the arbitration, a professional relationship with someone who did not participate in the arbitration is even less problematic. We therefore conclude that Mr. Shapiro's undisclosed acquaintance with Mr. Grunley is insufficient to prove evident partiality.[8]

---

[8] Appellant also asserts that Mr. Shapiro evidenced partiality because he repeatedly questioned "witnesses solely in support of Grunley's position throughout the arbitration" and told the parties "that 'most of what he needed' for the case was contained in a small binder of documents distributed by counsel for Grunley during his opening statement." There is no transcript of the proceedings to support these assertions, nor does the record describe what was in the binder. We will not consider such conclusory arguments on appeal. *See Wagner v. Georgetown Univ. Med. Ctr*., 768 A.2d 546, 554 n.9 (D.C. 2001) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (quoting *United States v. Zannino*, 895 F.2d 1, 16 (1st Cir. 1990)).

The law firm's past representation of Euro or its affiliate is an apt illustration of a distant and impersonal relationship that does not demonstrate evident partiality of Mr. Shapiro. Mr. Shapiro of course has a professional relationship with other attorneys working in the same law firm. These colleagues obviously had a professional relationship with their client – Euro or its affiliate. But Judge Epstein found "that the representation ended two years before the arbitration proceeding began." Therefore, Mr. Shapiro's relationship to Euro (the party to the arbitration) is indirect at best, straining any argument that it establishes his partiality.[9] On this record, Calderon has not established evident partiality.[10]

---

[9] Calderon relies on Rule 1.10 of the Rules of Professional Conduct to support its claim that Mr. Shapiro had a duty of loyalty to his firm's former client (which it claims was Euro, not an affiliate). Rule 1.10 provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9." This argument fails for the simple reason that Mr. Shapiro, as a neutral arbitrator, did not represent anyone in the arbitration. Furthermore, as Judge Epstein correctly noted, "any duty that Mr. Shapiro had to his law firm's former land use client is not implicated by his service on an arbitration panel concerning an *unrelated dispute*."

[10] Calderon also presents an argument that could fit under the umbrella of arbitrator misconduct, a ground for vacatur specified in § 16-4423(a). It asserts that Mr. Shapiro and Mr. Grunley engaged in ex parte communications by participating in AGC board meetings, as well as by attending a social event hosted by the AGC. As Judge Epstein concluded, this argument fails on both factual and legal grounds. "Allegheny and Calderon offer no evidence that Messrs. Shapiro and Grunley actually spoke while the arbitration was ongoing, and Grunley submitted an affidavit by Mr. Grunley stating that he does not recall speaking with Mr. Shapiro at that time." This finding is not clearly erroneous. As for legal

(continued…)

### 3. The Trial Court Did Not Abuse Its Discretion.

We agree with Judge Epstein's observation that "[i]t is advisable for an arbitrator to err on the side of disclosure." That surely would have been the prudent course here. Even so, Judge Epstein concluded that disclosure was not required under § 4412(a) because "a reasonable person would not consider these relationships, individually or collectively, likely to affect Mr. Shapiro's impartiality." We need not decide this question, however. Ruling in the alternative, the court stated that it "would exercise its discretion under § 4412(d) not to vacate the award because the relationships that Mr. Shapiro did not disclose do not create . . . a reasonable likelihood of bias[.]" We discern no abuse of

-----

(…continued)

inadequacy, Judge Epstein focused first on the rules of professional conduct and determined that "[a] prohibition on ex parte communications . . . does not prevent Mr. Shapiro from talking to Mr. Grunley (or anyone) about matters that are not related to the arbitration proceeding." However, appellant asserts that an addendum to the agreement to arbitrate provided a broader definition of ex parte contact when it required that "[a]ll communications with the Arbitrators by any Party or a Party's attorney shall be made at a hearing or in a conference call with all opposing Parties and/or their attorneys having been given a reasonable opportunity to participate." Even if this agreement was intended to cover all communications, regardless of subject matter, the prohibition was limited to "Arbitrators" and "any Party or a Party's attorney." As explained above, Mr. Grunley was not a party to the arbitration, nor did he represent Grunley Construction. Therefore, we will not disturb Judge Epstein's decision concerning ex parte communications.

discretion in that ruling. *See Johnson v. United States*, 398 A.2d 354, 361-362 (D.C. 1979) ("Discretion signifies choice."; "The concept of 'exercise of discretion' is a review-restraining one.").[11]

### III. Merits of the Award

Calderon also contends that "the arbitrators manifestly disregarded the facts and law resulting in an award that was arbitrary and capricious." It reasons that because Euro was contractually obligated to cover subcontractor costs that Grunley incurred, Grunley did not suffer any damages attributable to Calderon once Grunley and Euro settled their own dispute over the project. Calderon attempts to support this contention by comparing its version of the costs that Grunley incurred to the amount of money that Grunley received from its settlement with Euro. Calderon contends that Grunley received more money in settlement than it had actually incurred in costs, and that the arbitration award would only serve to increase this undeserved windfall. Grunley answers with its own set of sums to

---

[11] Under the abuse of discretion standard of review, we might also have affirmed Judge Epstein's ruling had he decided to vacate the arbitration award. *See Johnson*, 398 A.2d at 361 ("[T]he decision-maker exercising discretion has the ability to choose from a range of permissible conclusions. The decision-making activity is not ministerial and the various elements of the problem do not preordain a single permissible conclusion.").

ultimately argue that its losses due to subcontractor costs far exceeded its settlement with Euro, meaning that there remained uncompensated losses attributable to Calderon. Judge Epstein's order explained that "Calderon made the same argument to the arbitrators" and "cannot relitigate the issue here."

Calderon also challenges the arbitrators' award of attorney's fees because "[t]here was no proof of payment for the attorneys' fee award nor was there any testimony of the reasonableness of the fees or expenses." Grunley urges us to leave the attorney's fees award undisturbed, arguing that the arbitrators must have considered $700,000 reasonable since Grunley actually asked for $982,748. The trial court declined to second-guess the "collective experience [of the arbitrators] in deciding what fees were reasonable."

"It is firmly established that judicial review of an arbitrator's decision is extremely limited, and a party seeking to set it aside has a heavy burden." *Stuart v. Walker*, 143 A.3d 761, 768 (D.C. 2016). Judicial review is not available merely because a party "received an unfavorable result." *Id*. Instead, review is limited to the grounds set forth in D.C. Code § 16-4423. *Id*. Those enumerated grounds do not include "manifest disregard," but we have said in the past that "court inquiry may be undertaken" "where it appears that the arbitrator manifestly disregarded the

law, . . . at least when the decision approaches being arbitrary and capricious." *Cathedral Ave. Co-op., Inc. v. Carter*, 947 A.2d 1143, 1151 (D.C. 2008) (cleaned up).[12]   We therefore will assume, for purposes of argument, that a court may review an arbitration award for "manifest disregard."[13]   However, this is an "extreme exception" to the general rule that we "will not review an arbitration decision on the merits." *Id*.  Calderon has not demonstrated that this is such an extreme situation.

"At its core, arbitration is supposed to be an alternative to litigation in a court of law, not a prelude to it."  Uniform Arbitration Act (2000) § 23, cmt. B.1. Like Judge Epstein, we decline Calderon's invitation to surmise what the arbitrators must have been thinking when they issued the award or to delve into the issues ourselves.  To substitute our judgment for that of the arbitrators would

---

[12]   Although we have said as much, we are not aware of a case where this court has vacated an award on the ground that an arbitrator manifestly disregarded the law.

[13]   *But see A1 Team USA Holdings, LLC v. Bingham McCutchen*, *LLP*, 998 A.2d 320, 324 (D.C. 2010) (noting that, in approving the model Revised Uniform Arbitration Act, "the NCCUSL considered but decided . . . not to add provisions to Section 23 which would have allowed vacatur of an arbitration award on the grounds of 'manifest disregard of the law' and 'public policy.'"); *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953, 959 n.4 (D.C. 2008) ("[I]t is not clear that we have any such authority [to vacate an award for manifest disregard of the law] that is independent of, or broader than, the statutory authority granted to us . . . .").

betray the "policy – inherent in election of arbitration over a judicial trial – that the parties have bargained for the arbitrators' judgment, even more than for legal correctness, and thus should not be deprived of that judgment." *Cathedral Ave. Co-op.*, 947 A.2d at 1152.

## IV. Grunley's Motion for Attorney's Fees

After the trial court confirmed the arbitration award, Grunley moved for attorney's fees and expenses as authorized by D.C. Code § 16-4425(c).[14]  Rule 54(d) of the Superior Court Rules of Civil Procedure governs the process for seeking attorney's fees and requires that a motion,

> (i) be filed no later than 14 days after the entry of judgment; (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award; (iii) state the amount sought or provide a fair estimate of it; and (iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

---

[14] "On application of a prevailing party to a contested judicial proceeding under § 16-4422, 16-4423, or 16-4424, the court may add reasonable attorney's fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made to a judgment confirming, vacating without directing a rehearing, modifying, or correcting an award." D.C. Code § 16-4425(c).

The court denied Grunley's Rule 54(d) motion on the ground that it failed to provide "information 'sufficiently detailed to permit the Court to make an independent determination whether or not the hours claimed are justified.'" (quoting *Tenants of 710 Jefferson Street v. District of Columbia Rental Hous. Comm'n*, 123 A.3d 170, 187 (D.C. 2015)). In its cross-appeal, Grunley argues that its failure to attach documents fully supporting the motion at the time of filing was not a proper ground for denial because its motion complied with Rule 54(d).

"When interpreting a Superior Court rule, we frequently find guidance in the advisory committee's notes to the corresponding federal rule." *District of Columbia v. Jackson*, 878 A.2d 489, 492 (D.C. 2005). We thus turn to the advisory committee notes for Rule 54 of the Federal Rules of Civil Procedure, which state that "[t]he rule does not require that the motion be supported at the time of filing with the evidentiary material bearing on the fees. This material must of course be submitted in due course, according to such schedule as the court may direct in light of the circumstances of the case."

While § 16-4425(c) states that "the court *may* add reasonable attorney's fees and other reasonable expenses" (emphasis added), the trial court did not exercise its discretion in this case. Indeed, it stated that, "[b]ecause the Court denies

Grunley's motion on this ground, it need not decide whether it should exercise its discretion to award attorney fees under D.C. Code § 16-4425." Consequently, we are not reviewing a discretionary decision entitled to deference; instead, we apply de novo review. *See Gibson v. Freeman*, 941 A.2d 1032, 1034-35 (D.C. 2008) (applying de novo review to the trial court's interpretation of a rule of civil procedure).

We conclude that Grunley's motion satisfied the requirements of Rule 54(d). It was timely, it invoked § 16-4425, and it requested $54,403.16 in attorney's fees and other expenses. The text of Rule 54(d) does not require the movant to submit full documentary support for the motion at the time of filing. Furthermore, the advisory committee notes for federal Rule 54 explicitly state that this is not necessary. *See* 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 2680 (4th ed., 2008, updated 2021) ("Because of the early filing deadline for fees, the rule does not require that the motion be fully supported at the time of filing by all of the evidentiary material bearing on fees. Rather, subparagraph (B) simply requires that the motion specify the grounds entitling the movant to a fee award and the amount or a fair estimate of the amount sought."). The court reasonably wanted additional information before ruling, and Grunley would have been well-advised to provide it at the outset, but the court erred by denying the

motion without giving Grunley an opportunity to submit more detailed records. Therefore, we vacate the order denying attorney's fees and remand to the trial court for further consideration of the motion.

## V. Conclusion

We affirm the court's judgment confirming the arbitration award. However, because Grunley's motion for attorney's fees met the facial requirements of Rule 54(d), we reverse the decision denying that motion and remand for further consideration.

*Affirmed in part and reversed in part.*